598 A.2d 1042

**WESTERN CENTER, DEPARTMENT OF PUBLIC WELFARE, Commonwealth of Pennsylvania, Petitioner,**

**v.**

**William L. HOON, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Feb. 14, 1991.

Decided Oct. 23, 1991.

214

Jeffrey P. Schmoyer, Asst. Counsel, for petitioner.

Theodore E. Breault, for respondent.

Before PELLEGRINI and KELLEY, JJ., and SILVESTRI, Senior Judge.

KELLEY, Judge.

This is an appeal by Western Center, Department of Public Welfare (employer) from an order of the State Civil Service Commission (commission) sustaining the appeal of William L. Hoon (employee) and overruling the removal of employee from employment as a regular Staff Dentist 1. The commission also ordered that employee be returned to duty as a regular Staff Dentist 1, and that he be reimbursed such wages and emoluments as would have been earned after serving a thirty-day suspension beginning September 22, 1989, less wages earned and benefits received. We affirm.

Employee was employed as a Staff Dentist 1, regular status, at employer's state facility for the mentally retarded from February 1984 until his removal on November 3, 1989. Employee was suspended from his position as Staff Dentist 1, regular status, for a period of time not to exceed thirty working days, effective September 22, 1989, pending investigation into alleged abuse. By letter dated November 2, 1989, employer informed employee that he was removed from his position effective November 3, 1989.

Although employee was suspended for "alleged abuse," employer ultimately based its termination of employee on charges that employee (1) made inappropriate, unprofessional and adverse philosophical statements during his presentation to an orientation class on May 4, 1989, and (2) provided inappropriate treatment for an appointing authority resident, J.M., on September 18, 1989. Employee appealed his suspension and removal to the commission which conducted a hearing on February 26, 1990. The commission concluded that employer had failed to establish just cause for removing employee, but that employer had established good cause for a thirty-day suspension. Therefore, the commission sustained employee's appeal from removal and ordered his return to work, and that he be reimbursed as if he had served a thirty-day suspension beginning September 22, 1989.

The issues presented by employer on appeal to this Court may properly be summarized as follows: (1) whether the commission's findings were supported by substantial evidence; and (2) whether the commission erred as a matter of law in concluding that employee's discussion of abuse policies was not just cause for removal. Our scope of review of an order of the Civil Service Commission is limited to determining whether constitutional rights have been violated, whether an error of law has been committed, and whether necessary factual findings made by the commission are supported by substantial evidence. *Nosko v. Somerset State Hospital,* 139 Pa.Commonwealth Ct. 367, 590 A.2d 844 (1991). Substantial evidence needed to support a finding of the State Civil Service Commission is such relevant evidence that a reasonable mind, without weighing evidence or substituting its judgment for that of the commission, might accept as adequate to support the conclusion reached. *Silvia v. Pennhurst Center, Department of Public Welfare,* 63 Pa.Commonwealth Ct. 75, 437 A.2d 535 (1981).

Initially, we note that a civil service employee can

be removed from his or her job only for just cause,[1] and that the appointing authority has the burden of proving just cause for the removal of an employee. *Rosselli v. Reading Housing Authority,* 116 Pa.Commonwealth Ct. 177, 541 A.2d 417 (1988). "Just cause" for dismissal of a regular civil service employee must be related to the employee's job performance and touch in some rational and logical manner upon that employee's competency and ability. *Doerr v. Pennsylvania Liquor Control Board,* 88 Pa.Commonwealth Ct. 610, 491 A.2d 299 (1985). Whether an employee's actions constitute just cause for dismissal is a question of law which is reviewable by this Court. *Department of Community Affairs v. Averette,* 104 Pa.Commonwealth Ct. 260, 521 A.2d 534 (1987).

## DISCUSSION OF ABUSE POLICY

Employer claims that it terminated employee for just cause because, in giving a presentation to newly-hired Residential Service Aides, employee was not authorized to discuss employer's Policy on the Prohibition of Abuse, Mistreatment or Neglect of clients (abuse policy), and also because the statements he made regarding client abuse were inappropriate. At the hearing held on February 26, 1990, there was substantial dispute among witnesses as to what occurred on May 4, 1989. With regard to employee's discussion of employer's abuse policy, Edward Joseph Szczypinski, employer's Labor Relations Coordinator, testified that employee's presentation was to focus primarily on dental services. He also claimed that another employee was scheduled to discuss the abuse policy as a separate and distinct part of the orientation program. Employee testified that the format of his presentation had been left "wide open", and that he had not been specifically told not to discuss employer's abuse policy.

1. Section 807 of the Civil Service Act, Act of August 5, 1941, P.L. 752, *as amended,* 71 P.S. § 741.807.

Employer relied on the testimony of Russell Delp to support its claim that employee had made inappropriate statements regarding abuse in the course of his unauthorized discussion of that subject. Delp, who was working undercover for the Office of the Inspector General as an aide-trainee at employer's premises on May 4, 1989, testified that he had attended employee's presentation, during which employee had made statements which Delp believed did not fit in with employer's standards. Specifically, Delp stated that employee had mentioned a "two-minute rule"[2] as a period in which one could get away with anything in dealing with residents. Delp also testified that employee had told the group of newly-hired Residential Service Aides that he had been reported for abuse and that they should not report other staff for abusing patients because such reports might affect one's career or result in undesirable work assignments.

Employee acknowledged that he had discussed the "two-minute rule" and that he had informed the class that he had been reported for abuse. However, employee disagreed with Delp's characterization of his comments, claiming that Delp's recollection of his presentation was inaccurate and that Delp had taken employee's statements out of context. Employee testified that he had explained the "two-minute rule" as providing a period of time in which one could utilize any approved restraint to conduct examinations or other procedures. He then explained that he had mentioned the charges of abuse against him to make the point that unfounded claims of abuse have serious implications.

The commission found that employee's unauthorized discussion of employer's abuse policy established good cause to support a thirty-day suspension. However, the commission did not believe that that discussion constituted just

2. Delp stated that employee did not define or otherwise indicate what he meant by "two-minute rule." Employee later testified that the "two-minute rule" had been explained to him in the summer of 1989 by William Schnofer, an individual in management at employer's facility, as an interval in which one could utilize any approved restraint while treating a patient.

cause to terminate employee.[3] In addition, the commission found, based on its first-hand observation of witnesses, Delp's motivations and personal concerns, and the fact that it believed Delp took employee's statements out of context, that Delp's testimony regarding specific statements by employee was neither credible nor responsible.[4] Accordingly, the commission concluded that employer failed to show that employee had made adverse philosophical statements at the May 4, 1989 orientation with regard to employer's abuse policy.

Employer claims that the commission failed to consider the significance and sensitivity of resident abuse, and that its conclusion regarding adverse philosophical statements is inconsistent with its finding that employee made statements regarding the "negative aspects" of reporting resident abuse. We disagree.

The thrust of employer's argument is that the commission should have believed its version of the events on May 4, 1989. However, where conflicting testimony has been presented, the commission is the sole fact finder. *Department of Public Welfare v. Sanders*, 102 Pa.Commonwealth Ct. 426, 518 A.2d 878 (1986). On reviewing an administrative order, the prevailing party is entitled to the benefit of every inference which can be logically and reasonably drawn from evidence viewed in the light most favorable to the prevailing party. *Doerr*. Because it is the commission's province to judge issues of credibility and resolve evidentiary conflicts, we will only examine, and not weigh, evidence before us and will not substitute our judgment for that of the commission. *Silvia*.

3. Section 952(c) of the Civil Service Act, added by Act of June 26, 1989, P.L. 47, 71 P.S. § 741.952(c), provides that "[i]n the case of any employee removed ... the commission may modify or set aside the action of the appointing authority."

4. The commission found that Delp had not sought clarification of employee's statements, and that Delp was more concerned with maintaining his cover than with ascertaining what employee actually intended by his statements.

■ In this case, the commission found that the appointing authority failed to show that employee made adverse philosophical statements during the May 4, 1989, orientation. The commission found Delp's testimony regarding specific statements made by employee during the presentation neither credible nor responsible. This credibility determination with regard to Delp's testimony was based on its first-hand observations of Delp, the circumstances surrounding the presentation made by employee on May 4, 1989, and Delp's admitted purpose for being present at that orientation.

■ The commission also concluded that although employee had not been sensitive to the impression his statements regarding the "negative aspects" of reporting abuse had on those attending his presentation, those statements were not contrary to employer's policies on abuse. Nevertheless, the commission concluded that employer had demonstrated that employee's presentation should have focused on dental services and not client abuse, and that employee's discussion of abuse policies was inappropriate. While the commission believed that employee should receive disciplinary action for such conduct, the commission did not believe that employee's removal was warranted, and therefore ordered employee's reinstatement.[5]

Our independent review of the record reveals that the commission's findings are supported by such relevant evidence that a reasonable mind might accept as adequate to support the commission's conclusions. Therefore, we will not disturb them.

### TREATMENT OF J.M.

■ Employer's second charge against employee was that employee failed to provide appropriate treatment to J.M., a profoundly retarded resident of employer's facility. With regard to this allegation, the commission made the following findings of fact. On September 18, 1989, employ-

5. See 71 P.S. § 741.952(c).

ee extracted two wisdom teeth from J.M. between 10:00 a.m. and 11:30 a.m. Employee removed J.M.'s teeth in approximately twenty minutes without difficulty, and that immediately following the surgery, J.M.'s sockets were fairly well clotted and his platelets were good. Employee advised an aide who accompanied J.M. and had assisted employee during the extractions, that J.M. would need bed rest following the procedure.

From the time J.M. returned to his unit, there was a constant oozing and swallowing of blood from J.M.'s extraction sites. There was nothing in J.M.'s chart indicating that J.M. would suck the blood clots from his sockets. Employee believed that nurses at employer's facility were capable of controlling bleeding from extraction sites.

Employee left his office at 4:00 p.m. on September 18, 1989. At about 10:00 p.m. that evening, Ms. Vionsky, a nurse at employer's facility, telephoned employee to inform him that at 9:30 p.m., J.M. had vomited blood and appeared to be sucking on his extraction sites. Prior to telephoning employee, Nurse Vionsky had telephoned the physician on call, Dr. Bartos. Dr. Bartos altered J.M.'s pain medication but failed to give Vionsky any additional instructions. Subsequently, J.M.'s blood volume continued to decrease, his blood pressure lowered, and his heart rate increased. J.M. was taken to the hospital the following day.

Employer claims that it had just cause to terminate employee because he failed to pack or suture the extraction sites, and gave no specific instructions to nursing or direct care staff concerning J.M.'s after care, attention to bleeding or other possible symptoms of distress. Employer also claims that employee's treatment of J.M. was inappropriate because he failed to communicate with direct care staff to obtain adequate pre-treatment information about J.M.

On direct examination, employee testified that he had considered placing gauze on the extraction sites. Employee stated that, because due to J.M.'s level of behavior he was likely to swallow the gauze, such a course of action was inappropriate. Employee also stated that he did not feel

sutures were required because he had made no incisions nor removed any bone, there was no excessive trauma, and J.M.'s condition appeared to be stable.

Employee further explained that although he had extracted thousands of teeth, he had not anticipated that J.M. would suck the clots out of his sockets because he had never heard of anyone sucking at their sockets, nor had he read of any such instances over the years. Employee also stated that he believed that the nurses on duty during the time in question were qualified to handle bleeding from extraction sites.

Dr. Theodore R. Paladino, a practicing oral and maxillofacial surgeon for some twenty-two years, testified as an expert witness on employee's behalf. It was Dr. Paladino's opinion that after the extractions were completed, there was no need for employee to suture the extraction sites. Dr. Paladino testified that employee's decision not to apply gauze was appropriate, due to J.M.'s severe mental retardation, and indicated that there was no way for employee to have anticipated that J.M. would suck the blood clots from his extraction sites.

With regard to employer's claim that employee should have instructed employer's nurses or support staff, Dr. Paladino stated that specific instructions concerning post-extraction treatment would have been appropriate only if employer's staff were untrained. However, Dr. Paladino pointed out that employer had physicians on call and registered nurses on the premises trained to treat medical-surgical problems, and that such personnel should probably have treated J.M. without even calling employee.

Dr. Paladino also testified that employer's medical records indicated that J.M. had begun bleeding at 12:00 noon. Based on this information, Dr. Paladino suggested that J.M. could have swallowed as much as four pints of blood by the time he vomited a substantial amount of blood at 9:30 p.m. Yet, no one notified employee concerning J.M.'s condition until 10:00 p.m.

Dr. Paladino further testified that despite ongoing medical record entries that oozing continued after employee had been called, no one at employer's facility had intervened or requested that employee be contacted again. Dr. Paladino characterized the treatment provided by employer's professional staff as "deplorable" based on his belief that they should have recognized these developments as a potential medical emergency.

Dr. Manorama Mishra, a medical doctor and Director of Health Services at employer's facility, testified on behalf of employer. Dr. Mishra claimed that employee should have instructed nurses and other support staff regarding the possibility of excessive bleeding, and suggested the appropriate course of action in case such bleeding occurred. However, Dr. Mishra conceded that Dr. Bartos was on call at the employer's facility on the evening of September 18, 1989, and acknowledged that there were nurses on duty who were assigned to take care of J.M. Dr. Mishra also acknowledged that employee was telephoned only once regarding J.M.'s condition.

The commission specifically found Dr. Mishra's testimony to be unauthoritative. The commission found Dr. Paladino's testimony completely credible. Based upon employee's testimony, and that of Dr. Paladino, the commission found that employee's treatment of J.M. was in accordance with proper dental procedures, and concluded that employer's evidence did not establish that employee had failed to provide adequate dental care. The commission also suggested, based on the evidence presented, that the employer's medical staff were derelict in their duties and responsibilities towards J.M., and that it appears employee was made the scapegoat for the medical staffs' failure to properly evaluate J.M.'s condition and provide him with proper medical care.

Employer argues that the commission erroneously discounted the testimony of Dr. Mishra in favor of Dr. Paladino's testimony. Employer claims that the commission failed to recognize that the charge against employee is not

that his treatment was below accepted dental standards, but rather that he did not perform in the manner expected of employees within employer's Health Care Unit. However, the only evidence of alleged infractions of employer's standard of care are contained in Dr. Mishra's testimony, which the commission found to be incredible.[6] As stated above, it is the commission's province to resolve evidentiary conflicts and issues of credibility.

Accordingly, we affirm.

## ORDER

AND NOW, this 23rd day of October, 1991, the order of the State Civil Service Commission, No. 8665, dated July 16, 1990, is affirmed.

SILVESTRI, Senior Judgè, dissenting.

I address myself solely to the allegations relating to the improper treatment of J.M. on September 18, 1989. The record indicates that prior to extracting two of J.M.'s wisdom teeth, Dr. Hoon made no specific inquiries regarding J.M.'s general behavior, level of functioning or ability to understand and follow directions for care of his extraction sites. Further, Dr. Hoon failed to give any verbal or written post-operative instructions to staff personnel regarding the supervision or treatment of the extraction sites. When confronted with this charge, Dr. Hoon did not dispute the allegation, but argued that the staff on duty should have been able to handle the bleeding problem and, thus, instructions were not necessary.

Based upon what they deemed the "completely credible" testimony and "very impressive credentials" of Dr. Theodore R. Paladino, the expert witness for Dr. Hoon, the Commission found that Dr. Hoon's treatment of J.M. was in

6. Although the commission did not specifically address the employer's allegation regarding pre-treatment information, employee testified that he had reviewed J.M.'s record. In addition, the commission found employee's testimony that he took J.M.'s capacity and condition into consideration in pursuing his course of treatment to be credible.

accordance with proper dental procedures and concluded that the evidence did not establish Dr. Hoon failed to provide adequate dental care.[1] The majority agrees and summarily dispenses with this issue. However, in doing so, both the Commission and majority fail to distinguish between the applicable medical standard of care for treatment of dental patients and for treatment of exceptional or mentally incapacitated dental patients.

What the Commission fails to recognize is that the charge against Dr. Hoon was not that his treatment of J.M. fell below accepted dental standards, but rather that Dr. Hoon failed to perform in an appropriate manner with respect to treatment of, in this case, a profoundly retarded individual, thus failing to meet performance standards expressed in the client care policy of Western Center and expected of employees working for Western Center.

The Western Center client care policy prohibits abuse, mistreatment or neglect of clients. Within the confines of the client care policy, an act of abuse is defined as "an act or an omission which causes or may reasonably be expected to cause physical or psychological pain to a client...." The policy also indicates that non-action which results in injury is viewed in the same manner as improper or excessive action. The policy explains that acts of abuse or omission are absolutely prohibited and are cause for disciplinary action including dismissal. Ignoring a need is an example of non-physical abuse according to the policy. The action or inaction of Dr. Hoon with respect to treatment of J.M. is

1. In their discussion, the commission refers to the conclusion by Dr. Paladino that "the medical treatment provided by the appointing authority (Western Center) professional staff was 'deplorable.'" R.R. 216. The Commission later states "[t]he evidence shows that the appointing authority's medical staff were derelict in their duties and responsibilities toward J.M." and finds Dr. Hoon "was made the scapegoat for the medical staffs' failure to properly evaluate J.M.'s condition and provide him with proper medical care." R.R. 217. Such statements by the Commission are uncalled for, irrelevant, and superfluous. The sole issue before the Commission was the propriety of Dr. Hoon's action or inaction with respect to the treatment of J.M. Treatment provided by the appointing authority staff was not at issue.

clearly violative of the express client care policy in existence at Western Center.

However, the majority chooses to ignore the distinction between treatment in accordance with general dental standards and failure to satisfy express written standards in the client care policy of Western Center, finding it is within the province of the Commission "to resolve evidentiary conflicts and issues of credibility." By so finding, the majority fails to perform the function of the judiciary, namely to protect the rights of a patient who lacks decision-making capacity. It is the tradition of courts of this Commonwealth to serve as proponents for the powerless and to protect those individuals who cannot protect themselves.

The failure of Dr. Hoon to determine J.M.'s mental understanding prior to treatment and to provide proper instructions to staff to insure adequate post-operative care clearly relate to job performance and establish just cause for Dr. Hoon's termination.