**STATE CORRECTIONAL INSTITUTION AT GRATERFORD, DEPARTMENT OF CORRECTIONS, Petitioner,**

*v.*

**STATE CIVIL SERVICE COMMISSION (TERRA), Respondent.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs Aug. 7, 1998.

Decided Sept. 25, 1998.

Robin M. Lewis, and David B. Farney, Camp Hill, for petitioner.

Debra K. Wallet, Camp Hill, for respondent, Robert Terra.

Before McGINLEY and PELLEGRINI, JJ., and LORD, Senior Judge.

PELLEGRINI, Judge.

The State Correctional Institution at Graterford, Department of Corrections (Department) petitions for review of the October 20, 1997 order of the State Civil Service Commission (Commission) modifying the discipline of Robert G. Terra (Terra) from a dismissal to a 30–day suspension and ordering backpay.

Terra worked as Security Captain (Corrections Officer 4) for the Department at SCI–Graterford (Graterford).[1] By letter dated February 21, 1996, Terra was informed that he was being discharged from his position effective at the close of business that day for the following reasons:

- failing to effectively manage the Security Office with respect to the manner in which evidence is to be identified, documented, stored and disposed;
- failing to maintain or ensure a Confidential Source of Information file; and
- failing to classify all tools and failing to ensure tool control reports were submitted and failing to maintain a complete set of all institutional tool inventories.

Terra appealed his termination to the Commission and a hearing was held pursuant to Section 951(a) of the Civil Service Act (Act), Act of August 5, 1941, P.L. 752, *as amended and added by*, 71 P.S. § 741.951(a).[2]

Before the Commission, the Department presented the testimony of Michael Dodson (Dodson), a Special Investigator–2 for the Department's Office of Professional Responsibility. Due to reports that inmates were receiving illegal drugs from the Security Office evidence room (evidence room) at Gra-

---

1. Terra's job description as Security Captain included the following responsibilities:

   Will be responsible for all information contained in Investigative and Administrative Reports and all Confidential Sources of Information coming to his attention.
   Will be responsible for arranging an annual Inspection and Evaluation of the Confidential Source Informant Files and will develop a report and submit it to the Bureau of Special Services, Reference Volume V, OM–064.13.
   Will designate an area for the safekeeping of Confidential Source Information file, outside of the Institution's Enclosure, Reference Volume V, OM–064.13.
   Will make monthly inspections of the C.I. and Institution Maintenance Department Shops, to assure that sound tool control is in place and is being enforced, Reference Volume VI, OM–082.087.

   In addition, the "Performance Standards for Managers/Supervisors" issued to Terra as a Security Captain also included the following duties:
   Develop an effective system for tracking and control of contraband;
   See that all contraband that is confiscated is described properly, logged and stored in a secure place.

2. Section 951(a) of the Act provides:

   Any regular employe in the classified service may, within twenty calendar days of receipt of notice from the appointing authority, appeal in writing to the commission. Any permanent separation, suspension for cause, furlough or demotion on the grounds that such action has been taken in his case in violation of the provisions of this act, upon receipt of such notice of appeal, the commission shall promptly schedule and hold a public hearing.

terford, Dodson testified that he was directed by his office to investigate Terra. He stated that on April 18, 1995, he and Special Investigator Michael Wolanin (Wolanin) visited the evidence room at Graterford and found two unsealed shoebox type-boxes of various narcotics inside a metal cabinet. He described that one box was marked "assorted drugs unlogged" and the other "assorted unlogged drugs" and contained assorted pills, marijuana, powdered substances and syringes.

Wolanin, also a Special Investigator 2 for the Department, corroborated Dodson's account of the April 18, 1995 visit to Graterford and stated that after he and Dodson looked through the unsealed boxes of loose, assorted drugs and found virtually no documentation and no chain of custody forms, they seized those boxes and a log from the evidence room. Wolanin testified that the following day, April 19, 1995, he inventoried and categorized the drugs from the two boxes himself, and that prior to his completion of the log, nothing contained in the boxes had been reflected on the evidence log that was likewise seized on April 18, 1995.

Sergeant Barry Klaptosky (Klaptosky), a Corrections Officer 2 at Graterford, testified that he had worked under the supervision of Terra in the Security Office since November of 1994. Klaptosky stated that Terra's predecessor, Captain Phillips, had never given Terra any instructions regarding the handling of evidence in the security vault and that when Terra was appointed to the position of Security Captain, the evidence room had been a mess. He stated that Terra had given him the responsibility of organizing all of the seized contraband in the evidence room, which he was to do in addition to conducting urine sample drug testing upon inmates. With respect to the two boxes seized by Dodson and Wolanin on April 18, 1995, Klaptosky testified that those boxes contained drugs and drug paraphernalia that did not have confiscation slips and that, at the time of the April 18, 1995 seizure, he was in the process of logging the contents so that they could subsequently be destroyed.

Jeffrey Beard (Beard), Regional Deputy Commissioner for the Department, testified that as a result of an October 1995 raid at Graterford, certain staff members, including Terra, were discharged or asked by the Department to resign. Beard stated that after an investigation of Terra, he determined his discharge was appropriate and felt Terra could no longer be trusted to perform his job. Beard admitted that shortly after the April 18, 1995 investigation by Dodson and Wolanin, Terra issued several new policy memoranda and put new security policies into place, but stated that he had not considered those actions in his decision to dismiss Terra. Finally, Beard acknowledged that the ultimate responsibility for tool control was with Terra's supervisor, Superintendent Vaughn, who had also participated in Terra's evaluations, but that Vaughn was not terminated because Beard felt he could still trust his decision making.

George Patrick (Patrick), an individual who was assigned as a transition team member at Graterford following the October 1995 raid, testified that he interviewed Terra, who told him that he had very little to do with Confidential Sources of Information (CSI), files but that one of his subordinates, Lieutenant Barone, handled all of the CSI files and that information relative to the informants named in those files was held in Barone's office. Patrick also described that during the interview, Terra told him that he did not believe that he had violated the CSI policy and did not use CSI files because he did not feel they were useful or reliable.

With regard to tool control, Patrick stated that most of the Department's Institutions maintained local policies and delegated tool control responsibilities to the Security Office under the direction of the Security Captain (which at Graterford would have been Terra). However, Patrick went on to testify that during his interview of Terra regarding the tool control policy, Terra told him that he was not responsible for tool control because it occurred at higher levels than his, specifically, at the level of Facilities Maintenance Manager. Patrick testified that Terra informed him that he had been involved in the periodic inspection of maintenance shops and correctional institution industries to monitor their compliance with the tool control policy. Patrick admitted that Terra told him that no

local policy had existed at Graterford when he was Security Captain. He stated that he found no local policy at Graterford that would assign any additional responsibility for tool control to Terra and found that no departmental tool control policy had previously been strictly enforced. Finally, Patrick admitted that he found no evidence that Terra failed to conduct tool control inspections but inferred that he did not conduct those inspections as evidenced by the widespread tool losses and subsequent retrievals during the October 1995 raid.

Steve Reilly (Reilly), the Department's personnel director, testified regarding the job description of "Security Captain." He stated that the responsibilities of the Security Captain included the collection and preservation of contraband evidence, annual inspections and evaluations of the CSI files, development and submission of reports to the Bureau of Special Services on CSI files, designation of an area for the safekeeping of CSI files outside of Graterford's enclosure, and monthly inspections of the institution and maintenance department shops to assure that sound tool control was being enforced. Reilly admitted that there was no indication from Terra's evaluation forms that he did not perform his duties and responsibilities as set forth in his job description and acknowledged that an employee's immediate supervisor is responsible for ensuring that the employee receives the necessary training.

Finally, Terra testified that after an October 24, 1995 raid at Graterford, Department officials transferred him to SCI–Frackville for "training," and that he was subsequently terminated on February 21, 1996. Terra described his duties as Security Captain as including investigations of both inmates and staff, protecting the security of the institution and any other duties designated to him by his supervisor, who at that time was Superintendent Vaughn. Terra stated that he had been appointed to the position of Security Captain by Superintendent Vaughn but had no specific training for that position other than help from subordinate officers and

occasional Security Captain programs throughout the state that provided him with additional limited training. Terra testified that he essentially tried to learn the position on a day-to-day basis.

Terra described the changes he implemented at Graterford after being appointed Security Captain, including acquiring a larger evidence room and tightening control and limiting access to that room. He also described other improvements made under his direction, including a great increase in the number of urine drug screening tests, increased cell searches, increased staff "shakedowns" leading to increased arrests of staff members for bringing contraband in and increased drug busts of inmates.

As to his collection, maintenance and disposal of contraband evidence and the April 18, 1995 investigation when Dodson and Wolanin seized the two boxes of undocumented drugs from the evidence room, Terra stated that the boxes that had been taken had not yet been inventoried into the new logging system but were in the process of being logged in to be subsequently destroyed. Terra testified that he had instructed Sergeant Klaptosky to log the evidence as best as he could, but that Klaptosky also was responsible for conducting between 20 to 30 urine drug screening tests per day. He stated that the two boxes had not been destroyed as of that time because they had to be properly logged prior to their destruction. Terra testified that prior to the seizure of those drugs on April 18, 1995, they had been locked inside a steel cabinet that was always padlocked and that inmates were never given access to the evidence room. Finally, Terra stated that on April 25, 1995, he issued a formal memorandum creating a new policy regarding the collection and retention of contraband in the evidence room.

As to his alleged violation of the Department's CSI policy and procedure, Terra testified that he had never seen an actual CSI policy [3] and did not use CSI files because he

---

**3.** He stated that he had made efforts prior to April 1995 to obtain Department policies and had formally requested those policies a few times from both the training coordinator and the ad-

ministrative assistant to the Deputy. Although he admitted that he received some policies, he stated that he received no policies regarding tool control or the CSI policies. He stated that he

did not believe that any inmate that was given information was reliable enough to designate as a CSI. Terra admitted that he believed there was an old CSI list in existence that was locked in Lieutenant Barone's file cabinet and had not been used for quite awhile. However, he stated that he had neither seen nor used that list but believed it to be very secure. Terra stated that he himself maintained no file that would be considered a CSI file.

As to tool control at Graterford, Terra admitted that he was aware that he had some responsibility that he described as monitoring the tools throughout the institution by making weekly inspections of the shops, maintenance shops and kitchen. However, he testified that he was told the tool control was under the supervision of the Maintenance Superintendent and that he had worked in coordination with the Maintenance Superintendent regarding tool control. He stated that he was never specifically directed to do anything with regard to tool control other than conduct periodic inspections, but that he did object to the Deputy regarding inmate "emergency plumbers and emergency electricians" being allowed access to tools. Finally, he noted that after he identified specific problems in Graterford's industry shops, such as unsecured grinding wheels and opened tool cages, he ensured that changes were made to secure them.

Terra testified that during his tenure as Security Captain at Graterford, he did not violate any policy that he was aware of and had worked to the best of his ability. Terra testified that he never received any unsatisfactory reviews, was never reprimanded regarding the implementation of CSI or tool control policies and was never told that he was not overseeing the evidence room in an adequate fashion. He stated that he had never been disciplined during his employment as a corrections officer but to the contrary had been commended and promoted.

At the conclusion of the hearing, the Commission found, *inter alia,* that:

- the Department failed to sustain its burden for the removal action, although

good cause for Terra's suspension existed;

- although Terra's job description included responsibilities for (a) collection and preservation of evidence, (b) maintenance of a CSI file outside the walls of Graterford and (c) sound tool control procedures to be in place and enforced, and although these requirements were set forth in Departmental policies, based on Terra's credible testimony and admissions from Department witnesses, the Departmental policies diverged from local SCI–Graterford policies and preceded Terra's tenure as Security Captain;

- after the April 18, 1995 investigation by Dodson and Wolanin, Terra began to develop and implement new policies and procedures;

- Terra credibly testified that he did not maintain CSI files because he found they were not reliable or useful;

- witnesses for the Department testified that Department institutions usually have local tool control policies in addition to Departmental tool control policies, but Terra credibly testified that there was no local tool control policy at Graterford;

- there was no evidence that Terra did not engage in tool control – only inferences that he failed in responsibilities based on testimony of Department witnesses that the facility fell short of Departmental expectations with regard to tool control;

- Terra credibly testified that he shared the responsibility for tool control with the Maintenance Department who had the lead role, and that he performed monthly inspections of Graterford's shops and kitchen to monitor tool control; and

- after the April 18, 1995 Department visit by Dodson and Wolanin, Terra was not given an opportunity to rectify the manner in which the Security Office was run or to bring it into compliance with Departmental standards, but was removed even though he had never

had never seen any CSI file or CSI policy and

was unsure of the CSI policy requirements.

previously been subject to criticism or discipline for management of the Security Office.

Because, while just cause[4] for removal did not exist, but good cause[5] for disciplinary action did, the Commission imposed a 30-day suspension but otherwise reinstated Terra to his former position and awarded backpay. This appeal by the Department followed.[6]

The Department contends that the Commission abused its discretion in modifying Terra's discipline to only a 30-day suspension because the evidence supported a finding of just cause for his removal. The Commission's authority to modify a penalty of the Department is contained in Section 952(c) of the Act, 71 P.S. § 741.952(c), which provides:

> In the case of an employe removed, furloughed, suspended or demoted, the commission may modify or set aside the action of the appointing authority. Where appropriate, the commission may order reinstatement, with the payment of so much of the salary or wages lost, including employe benefits, as the commission may in its discretion award.

Under this provision, the Commission has the power to modify the action of an appointing authority, even where the charges brought against the employee are proven. *Galant v. Department of Environmental Resources*, 534 Pa. 17, 626 A.2d 496 (1993); *see also Pennsylvania Liquor Control Board v. Flannery*, 141 Pa.Cmwlth. 228, 595 A.2d 685

(1991) (where the Commission found that an employee of a state liquor store was "lax" in assuming he could take samples for his own use but did not intend to take Commonwealth property, the Commission acted within its discretion by modifying his dismissal to a 30-day suspension).

Acknowledging that the Commission, under this provision, has wide latitude in modifying its discipline, nonetheless, citing to *Department of Corrections v. Roche*, 654 A.2d 64 (Pa.Cmwlth.), *petition for allowance of appeal denied*, 541 Pa. 644, 663 A.2d 695 (1995), the Department contends that the Commission abused its discretion by not discharging Terra because he violated Departmental policies.[7] In *Roche*, a corrections officer was discharged due to his failure to report an inmate beating and his perjury before a grand jury concerning the beatings. The Commission modified his penalty from removal to a 30-day suspension pursuant to Section 952(c) of the Act. Despite concluding that the appointing authority had, in fact, proven that the employee violated the Code of Ethics, the Commission determined that his violations nonetheless did not warrant removal and imposed only a 30-day suspension. Although noting the Commission's wide discretion, we held that its discretion was not unfettered and because of the severity of the employee's actions, we determined that the Commission abused its discretion in not affirming the appointing authority's discharge. The Department contends that situation exists here because it ·

---

**4.** Section 807 of the Act, 71 P.S. § 741.807, provides that "[n]o regular employe in the classified service shall be removed except for just cause." The Appointing Authority has the burden of proving "just cause" for the removal of a correction officer. *State Correctional Institution at Graterford, Department of Corrections v. Brumfield*, 141 Pa.Cmwlth. 43, 594 A.2d 852 (1991). Although not defined in the Act, "just cause" for the dismissal of a regular civil service employee must be related to the employee's job performance and touch in some rational and logical manner upon that employee's competency and ability. *Western Center, Department of Public Welfare v. Hoon*, 143 Pa.Cmwlth. 212, 598 A.2d 1042 (1991). ·

**5.** Pursuant to Section 803 of the Act, 71 P.S. § 741.803, "[a]n appointing authority may for good cause suspend without pay for disciplinary

purposes an employe holding a position in the classified service."

**6.** Our scope of review of a decision of the Commission is limited to determining whether constitutional rights have been violated, whether an error of law has been committed, or whether substantial evidence supports the necessary findings of fact made by the Commission. *Nosko v. Somerset State Hospital*, 139 Pa.Cmwlth. 367, 590 A.2d 844 (1991). ·

**7.** In reviewing the Commission's modification of the penalty imposed by an appointing authority pursuant to Section 952(c), we are limited to determining whether the Commission committed an error of law, abused its discretion or found facts that were not supported by substantial evidence. *Metrick v. Civil Service Commission*, 687 A.2d 26 (Pa.Cmwlth.1996).

showed that Terra's conduct was such that that the Commission abused its discretion in not finding just cause for removal.

█ The limits on the Commission's discretion that we delineated in *Roche* are akin to the "essence test" standard that we use to review grievance-arbitrations under Act 195, Act of July 23, 1970, P.L. 563, *as amended,* 43 P.S. §§ 1101.101–2301. Under that standard, if the arbitrator's decision is one that, after reviewing the evidence, no rational person could agree that the outcome imposed by the arbitrator was proper, i.e. that it was manifestly unreasonable, then that decision can be reversed. *See, e.g., Pennsylvania Liquor Control Board v. Independent State Stores Union,* 520 Pa. 266, 553 A.2d 948 (1989) (award not rational where arbitrator found grievant guilty of theft and other crimes against employer, but considered other factors in mitigation in determining that there was no "just cause" for his discharge and substituted a lesser penalty); *County of Centre v. Musser,* 519 Pa. 380, 548 A.2d 1194 (1988) (award was not rational where arbitrator found grievants to have engaged in abusive conduct to an inmate of the prison, including assaultive behavior, but arbitrator considered certain mitigating factors to find no "just cause" for dismissal and substituted a lesser penalty).

In this case, although Terra was found to have violated Departmental policies, in light of the evidence, we are unable to say that the Commission's decision to modify Terra's penalty is one that no reasonable person would consider irrational. As the Commission found, even though Terra's job description delineated specific policies regarding the control, storage and disposal of contraband evidence to be implemented and complied with in his position as Security Captain, the standard practice at Graterford even before Terra's appointment was different than those Departmental policies. With respect to Terra's alleged violation of the CSI policy, the Commission found that Terra did not maintain any CSI file because he found them to be unreliable and not useful so that he could not have violated any policy dictating how the CSI file was to be managed and updated. Finally, the Commission found no evidence to sustain any charge that Terra violated the tool control policy at Graterford because Terra did assume some responsibility for tool control, and not only did Graterford's local tool control policy differ from the Department wide tool control policy, but no local tool control policy for Graterford could be found.

█ Based on this evidence, we cannot say that the Commission abused its discretion by modifying the penalty from a dismissal to a 30–day suspension. Accordingly, the decision of the Commission is affirmed.

### ORDER

AND NOW, this 25th day of September, 1998, the October 21, 1997 decision and order of the State Civil Service Commission, No. 19177, is affirmed.