**PENNSYLVANIA DEPARTMENT OF CORRECTIONS, Petitioner**

v.

**STATE CIVIL SERVICE COMMISSION (CLAPPER), Respondent.**

Commonwealth Court of Pennsylvania.

Argued Sept. 11, 2003.

Decided Feb. 17, 2004.

---

1. Section 607.1 of the Real Estate Tax Sale Law, Act of July 7, 1947, P.L. 1368, *as amend-* *ed,* 72 P.S. § 5860.607a.

Michael J. McGovern, Camp Hill, for petitioner.

Gary L. Kelley, Harrisburg, for respondent.

BEFORE: FRIEDMAN, Judge, LEAVITT, Judge and MIRARCHI, Senior Judge.

OPINION BY Judge LEAVITT.

The Department of Corrections (Department) petitions for review of the adjudication of the State Civil Service Commission (Commission) sustaining the appeal of Sergeant Sean P. Clapper (Clapper) and overruling the Department's termination of Clapper's employment at the State Correctional Institution at Huntingdon (Huntingdon). The Commission concluded the Department did not meet its burden of proving a just cause for termination and, therefore, modified the Department's discipline to a 30 day suspension.

Clapper's termination stemmed from an incident that occurred on February 2, 2002.[1] On this day, an inmate was given cleaning supplies, a floor brush, cleaning rags, toilet brush and water basin while confined in a Restricted Housing Unit (RHU). This was a mistake because inmates in the RHU are not permitted to have such supplies. Upon realizing their error, the corrections officers negotiated with the inmate for the return of the supplies, but they were not successful.

Clapper was then advised of the situation and approached the inmate's cell with the other officers. The inmate demanded that his water be turned on and that he receive toilet paper in exchange for the supplies. When the water was turned on, the inmate returned a toilet brush and water basin, but he retained the floor brush and cleaning rag. When further negotiations failed, Clapper informed the inmate that if the remaining supplies were not returned, the officers would enter his cell to retrieve them. The inmate took a step back and invited the officers to do so.

---

1. At the time, Clapper was employed at Huntingdon as a Corrections Officer 2, with oversight responsibility for the work of other correction officers.

Sometime between 8:00 a.m. and 8:35 a.m., the cell door opened and four officers, not including Clapper, went into the cell. They restrained the inmate, recovered the cleaning supplies and left. As far as Clapper could tell, none of the officers kicked, punched, struck, scratched or in any way injured the inmate. Neither Clapper nor the other officers wrote up a report of the incident.

Later that day the inmate in question sought medical treatment,[2] and as a result Major Weaverling (Weaverling),[3] directed Lieutenant Hayes (Hayes), Clapper's supervisor, to conduct an investigation into the incident. Hayes met with Clapper at approximately 11:00 a.m. and advised him that he needed a statement regarding the RHU incident. Hayes asked Clapper to prepare an incident report about any occurrences in the RHU between the specific time period of 8:45 a.m. and 9:45 a.m. Hayes informed Clapper that there was a surveillance tape of the incident and that he knew corrections officers had entered the cell. Hayes then called in the other officers and directed them to prepare incident reports.

After reviewing these reports, Weaverling determined that they were too vague; accordingly, he directed Hayes to return to the RHU and obtain clear, concise and complete statements from all the officers. In response, Clapper added two sentences to his report, "[l]et it be known that at no time did I enter the [inmate's] cell at or before 0945" and "[a]lso let it be known that I have no knowledge of anyone entering [the inmate's cell]." Reproduced Record A0211 (R.R. ___). Clapper and the other officers involved then concluded their shift. Weaverling continued his investigation the next day by interviewing Clapper and the other corrections officers. He concluded that the other officers corrected their account of the incident but that Clapper had not.

The following day, February 4, 2000, Clapper then submitted a second report. In this report Clapper stated that

[a]lso the decision to not mention this situation was a mutual agreement among those involved ... I would also like to add that I do take full responsibility for my actions and decisions and I realize that those decisions were incorrect. Also I would like to apologize to the administration for the embarrassment that I have caused the Department.

R.R. A0214.

A pre-disciplinary conference was held on March 1, 2002, and on March 18, 2002, Clapper was informed by letter that he was terminated from employment effective March 19, 2002. In support of its action, the Department asserted that

[O]n February 2, 2002, you were involved in an incident in the Restricted Housing Unit wherein the cell door of an inmate was opened and entered without first having obtained permission from a Commissioned Officer. That incident resulted in physical injuries to the inmate that required the attention of the Medical Services Department.

It is further alleged that you failed to write initial incident reports pertaining to the incident and that you initially failed to give complete and truthful answers to the investigator who was conducting the investigation.

Testimony presented at the [pre-disciplinary conference] revealed that you or-

---

2. No evidence was offered about the inmate's medical condition or extent of treatment.

3. Weaverling was Shift Commander in charge of Huntingdon on February 2, 2002.

dered the opening of the door and that you advised the other staff not to report what had happened.

R.R. AO176. The Department asserted that Clapper's conduct violated the Department of Corrections' Code of Ethics (Code), which violations required his termination.[4]

Clapper appealed his termination to the Commission, and a hearing was held pursuant to Section 951(1) of the Civil Service Act (Act), Act of August 5, 1941, P.L. 752, *as amended,* 71 P.S. § 741.951(a). At the hearing, Clapper testified that although he worked in the RHU, he was not familiar with the written RHU policies and procedures for opening a cell because he had

4. Specifically Clapper was charged with violating Section A–1 relating to sexual harassment; Section B–1, relating to treatment of inmates; Section B–2 relating to the use of force; Section B–10 relating to employee conduct; Section B–14, relating to reporting information indicating that the rules have been violated; Section B–22 relating to the truthfulness of reports; Section B–29 relating to cooperating during internal investigations; Department Policy 06.05.01, Administration of Security Level 5 Housing Units, Section D.7.a, relating to the opening of cell doors; and Department Policy DC–ADM 201, relating to the use of force.

Code Section A–1 provides:
The responsibility of all corrections employees is to act in relation to all citizens of the Commonwealth without regard to age, race, color, ancestry, creed, sex, marital status, national origin, non-job related handicap, or political beliefs. This necessarily includes inmates whom we supervise and fellow employees with whom we work. All employees are expected to fully comply with the Department of Corrections policy prohibiting harassment.

Code Section B–1 provides:
Each employee ... is expected to subscribe to the principle that something positive can be done for each inmate. This principle is to be applied without exception. This involves an intelligent, humane, and impartial treatment of inmates. Profanity directed to inmates, or vengeful, brutal, or discriminatory treatment of inmates will not be tolerated. Corporal punishment shall not be utilized under any circumstances.

Code Section B–2 provides, in relevant part,
Only the minimum amount of force necessary to defend oneself or others, to prevent escape, to prevent serious injury or damage to property or to quell a disturbance or riot will be used. Excessive force, violence or intimidation will not be tolerated.

Code Section B–10 provides:
Employees are expected to treat their peers, supervisors and the general public with respect and conduct themselves properly and professionally at all times; unacceptable conduct or insolence will not be tolerated.

Code Section B–14 provides:
Employees will promptly report to their supervisor any information which comes to their attention and indicates violation of the law, rules, and/or regulations of the Department of Corrections by either an employe or an inmate, and will maintain reasonable familiarity with the provisions of such directives.

Code Section B–22 provides:
An employe shall submit any necessary and/or requested work related reports in a timely manner and in accordance with existing regulations. Reports submitted by employes shall be truthful and no employe shall knowingly enter or cause to be entered any inaccurate, false, or improper information or data, or misrepresent the facts in any Department record or report.

Code Section B–29 provides, in relevant part:
All employees shall comply and cooperate with internal investigations conducted under the authority of the Department of Corrections, and respond to questions completely and truthfully.

Department Policy 06.05.01(7)(a)(3) provides:
A cell door in the L5 Unit shall not be opened unless a minimum of two (2) Corrections Officers is [sic] present at the cell. Before opening an occupied L5 Unit cell in an emergency, staff assigned to the Unit shall notify Control and receive direction from a Commissioned Officer. Only in life-threatening emergencies such as fire, suicide, and serious bodily harm shall a cell door be opened without the approved number of Corrections Officers and/or appropriate strip-search/handcuffing of the inmate.

not been allowed to attend the form "RHU school," in spite of his requests for this training. R.R. A0102. Clapper testified that based upon training received on the job, he believed that he could enter a cell in an emergency and that the February 2, 2002 incident was such an emergency. Clapper also testified that he was never informed that he needed to get permission from his superior officer before entering an inmate's cell. In addition, he specifically believed that he did not need to file an incident report because neither the inmate nor the officers were injured. In his opinion because the incident which lasted several seconds was not extraordinary it did not require an incident report.

The Commission considered each of the Department's nine charges lodged against Clapper and the evidence proffered to support them. It concluded that the Department's evidence only supported three violations and that these violations did not constitute just cause for termination.

Specifically, the Commission found that Clapper violated Code Section B–14 by failing to prepare promptly an incident report. The Commission noted that Clapper admitted that he did not report it to his superior officer. The Commission did not credit Clapper's testimony that he believed the incident was insufficiently unusual to report because this statement was contradicted by Clapper's statement that the situation was an "emergency" that required the cell to be opened.

The Commission also found that the Department proved Clapper's violation of Code Section B–22 because his reports were not true and accurate. Although Hayes requested a report on the specific time frame of 8:45 a.m. to 9:45 a.m., Clapper understood that Hayes was seeking information about the cell entry incident.

Nevertheless, Clapper did not correct Hayes on this time frame so that he could provide an accurate incident report. Further, Clapper himself admitted that he did not provide truthful statements.

Finally, the Commission found that the Department proved Clapper's violation of Code Section B–29, which requires cooperation in internal investigations. Clapper's own testimony established when he was first questioned he knew that Hayes was asking about the incident that occurred early on February 2, 2002. Rather than simply correct Hayes on the time frame, however, Clapper responded that nothing had happened. Subsequently, Clapper admitted that other corrections officers entered the cell, but his first statement was one of complete denial.

On the six other charges, the Commission held that the Department's evidence was either insufficient or utterly lacking and, thus, the violations were not proven. Specifically, the Department failed to prove that Clapper harassed the inmate on the basis of race or color in violation of Code Section A–1 because it presented no evidence on that issue. The Department failed to prove a violation of Code Section B–1, which prohibits brutal treatment of inmates, because it produced no evidence that the inmate was injured or that Clapper had even touched the inmate. The Department failed to prove a violation of Code Section B–2 because it did not present any evidence that Clapper entered the inmate's cell, used or authorized excessive force. For the same reason the Department did not prove a violation of Policy DC–ADM 201, relating to the proper use of force. The Department failed to prove that Clapper treated his peers, supervisors or a member of the general population unprofessionally or improperly, as prohib-

ited by Code Section B–10.[5] The Department failed to present evidence that Clapper ordered the inmate's cell door to be opened and, thus, failed to prove a violation of Policy 06.05.01(7)(1)(3).

The six unproved charges were relied upon by the Department as the basis of its termination. Because they were not proven, the Commission refused to affirm the Department's decision to terminate Clapper. Nevertheless, it held that the Department's establishment of three of the charges warranted discipline. Accordingly, the Commission modified the Department's action to a 30 day suspension pursuant to Section 803 of the Act.[6]

On appeal,[7] the Department contends that the Commission erred as a matter of law when it determined that the Department failed to prove just cause[8] for Clapper's termination. It also argues that the Commission exceeded its statutory authority by ordering Clapper's reinstatement and modifying his discipline. In support, the Department refers this Court to case law precedent that it believes requires a reversal of the Commission.

The Department first relies upon *Department of Corrections v. Roche*, 654 A.2d 64 (Pa.Cmwlth.1995), in which a corrections officer was discharged for failing to report inmate beatings. He had also participated in an attempt to cover up the criminal actions of his fellow corrections officers by lying not only to the officers who conducted the internal investigation, but also to a United States District Court Grand Jury convened to investigate the beating. The Commission held that this misconduct and subsequent indictment did not show just cause for termination. This Court reversed, holding that the Commission abused its discretion.

---

**5.** The Department challenges this conclusion by arguing that "[b]y definition, if an employee violates Sections B–14, B–22 and B–29 of the Code of Ethics by submitting multiple reports which he admits were untrue, he has failed to treat his supervisors with respect or conducts himself professionally." Department's Brief at 16. As recognized by the Department, this challenge goes to the weight of the evidence and credibility determinations which are for the Commission to decide. *Balas v. Department of Public Welfare*, 151 Pa. Cmwlth. 53, 616 A.2d 143, 148 (1992). To the extent the Department presented evidence, it was in the form of properly objected to hearsay which evidence is not competent, in and of itself, to support a finding in an administrative hearing. *Davis v. Civil Service Commission of Philadelphia*, 820 A.2d 874, 879 (Pa.Cmwlth.2003). Upon our review of the record, we cannot conclude that the Commission erred in finding the Department "failed to provide any evidence that [Clapper] improperly treated his peers, supervisors, or a member of the general population." R.R. A0235.

**6.** It provides in relevant part, "[a]n appointing authority may for good cause suspend without pay for disciplinary purposes an em-

ploye holding a position in the classified service." 71 P.S. 741.803.

**7.** The standard of review involving agency adjudications is limited to a determination of whether constitutional rights have been violated, errors of law have been committed, or whether the findings of the agency are supported by substantial evidence. *Bowman v. Department of Environmental Resources*, 549 Pa. 65, 700 A.2d 427 (1997).

**8.** Section 807 of the Act, 71 P.S. § 741.807, provides that employees in the classified service may be removed upon a showing of just cause, and the burden is on the Department to prove "just cause" for the removal of a corrections officer. *State Correctional Institution at Graterford v. State Civil Service Commission (Terra)*, 718 A.2d 403, 408 n. 4 (Pa. Cmwlth.1998). Although not defined in the Act, "just cause" for the dismissal of a regular civil service employee must be related to the employee's job performance and touch, in a rational and logical manner, upon the employee's competency and ability to perform. *Pennsylvania Game Commission v. State Civil Service Commission (Toth)*, 561 Pa. 19, 28, 747 A.2d 887, 892 (2000).

The Department next directs our attention to *Pennsylvania Game Commission v. State Civil Service Commission (Toth)*, 720 A.2d 1065 (Pa.Cmwlth.1998). In that case, the employee had been discharged for falsifying fellow employee anniversary dates in the Commonwealth's payroll computer in order to move those employees to the next step on the Commonwealth's pay scale. The job responsibility of the terminated employee was to protect the integrity of the payroll system; he admitted that he did the wrong thing. His actions were also found to have violated the Pennsylvania Crimes Code. Again, this Court reversed the Commission's decision that the appointing authority did not show just cause for termination.

■ The facts in this case are distinguishable from those in *Roche* and *Toth*. Here, the Department established that Clapper failed to report the incident promptly and accurately and that he failed to cooperate in the investigation by giving a literal reading to Hayes' questions. One day later, Clapper acknowledged his mistake and apologized. This is not comparable to the conduct in *Roche*, where the corrections officer participated in mistreatment of inmates by failing to report the incidents and then actively engaging in a cover-up, or to that in *Toth*, where the discharged employee committed theft of taxpayer funds. The conduct at issue in *Roche* and *Toth* was criminal. Clapper's conduct was not criminal, and it did not involve physical mistreatment of inmates. His conduct showed bad judgment, and for that the Commission imposed a suspension. In short, the holdings in *Roche* and *Toth* do not compel a reversal of the Commission.[9]

The Department next contends that the Commission exceeded its authority when it modified the Department's discipline of Clapper. The Department concedes that the Commission has wide latitude under Section 952(c) of the Act.[10] However, it argues that the Commission's discretion is not without limits[11] and that those limits have been breached in this case.

The Commission's authority to modify a penalty of the Department is contained in Section 952(c) of the Act. It states, in relevant part, as follows:

> In the case of any employe removed, furloughed, suspended, or demoted, the *commission may modify or set aside the action* of the appointing authority. *Where appropriate, the commission may order reinstatement,* with the payment of so much of the salary or wages lost, including employe benefits, as the commission may in its discretion award.

71 P.S. § 741.952(c) (emphasis added). This provision authorizes the Commission to modify the action of an appointing authority, even where the charges brought

---

9. The Department asserts that the Commission erred as a matter of law in not finding just cause for termination. Its argument, however, is focused on the facts. In other words, it disagrees with the factual findings of the Commission, but it does not claim they are not supported by substantial evidence. It simply advances its own interpretation of the February 2, 2002 incident and subsequent investigation.

10. Section 952(c), added by Section 21 of the Act of June 26, 1989, P.L. 47, 71 P.S. § 741.952.

11. The Department frames this issue as an error of law, but its argument is directed to whether the Commission abused its discretion in modifying the termination to a suspension. Consideration of whether the agency's determination is in accordance with law may include, as a component, whether the agency abused its discretion. *Bosnjak v. State Civil Service Commission*, 781 A.2d 1280, 1287 (Pa. Cmwlth.2001).

against the employee are proven. *Galant v. Department of Environmental Resources,* 534 Pa. 17, 626 A.2d 496 (1993). A modification that includes reinstatement is limited to circumstances "where appropriate."

 The Department correctly notes that our Supreme Court has held the Commission's authority under Section 952(c) is not without boundaries. *Pennsylvania Game Commission v. State Civil Service Commission (Toth),* 561 Pa. 19, 747 A.2d 887. Prior to *Toth,* this Court had established a standard of deference to the Commission's exercise of its modification authority comparable to that given to arbitration awards, known as the "essence test." Unless the Commission's modification of discipline was manifestly unreasonable, a modification would be upheld. *See State Correctional Institute at Graterford v. State Civil Service Commission (Terra),* 718 A.2d 403 (Pa.Cmwlth.1998). However, in *Toth,* 561 Pa. at 27, n. 7, 747 A.2d 887, 891, n. 7, the Supreme Court held that the essence test should not be used when reviewing the Commission's modification of an appointing authority's discipline. It clarified that the appropriate standard for reviewing a modification is that enunciated in *Bowman v. Department of Environmental Resources,* 549 Pa. 65, 69, 700 A.2d 427, 428 (1997) (emphasis added), wherein the Supreme Court explained as follows:

> [C]ourts will not review the actions of governmental bodies or administrative tribunals involving acts of discretion in the absence of bad faith, fraud, capricious action or abuse of power.... That the court might have a different opinion or judgment in regard to the action of the agency is not a sufficient ground for interference; *judicial discretion may not be substituted for administrative discretion.*

Here, we consider employee misconduct that is not so egregious that we can say that the Commission abused its discretion in modifying the Department's discipline. First, this is a case where the Department proved only three of the nine charges lodged against Clapper. The Commission can modify discipline where all violations are proven; *a fortieri,* its discretion to modify may properly be exercised where charges are *not* proven. Second, the Department does not claim that the Commission acted capriciously or in bad faith. In the end, the Department really asks that this Court substitute its judgment for that of the Commission; under *Bowman,* this is not sufficient ground for interference.

In sum, the circumstances in this case were appropriate for the exercise of the Commission's authority under Section 952(c) of the Act. We hold, therefore, that the Commission properly exercised its authority to modify the Department's discipline to a suspension and to reinstate Clapper.

For these reasons, the Commission is affirmed.

### ORDER

AND NOW, this 17th day of February, 2004, the order of the State Civil Service Commission dated December 11, 2002, in the above captioned matter is hereby affirmed.

Dissenting Opinion by Judge
FRIEDMAN.

I respectfully dissent. In this appeal, the State Civil Service Commission (Commission) determined that Sean P. Clapper's (Clapper) failure to follow proper procedures *"reflect[ed] on his ability to properly execute his duties as a correction officer"* but, nevertheless, concluded that the Department of Corrections (Department) did not have just cause to terminate

Clapper. (R.R. at 227.) The majority agrees, concluding that because Clapper's conduct showed only "bad judgment," the **Commission had statutory authority to modify the discipline** and impose a suspension. (Majority's op. at 532). I cannot agree. Rather, I believe that the Department established just cause for Clapper's termination as a matter of law and that the Commission exceeded its statutory authority in modifying Clapper's discipline.

The Commission found the following relevant facts. On February 2, 2002, between 8:25 a.m. and 8:35 a.m., four officers under Clapper's supervision attempted to retrieve cleaning supplies from an inmate's cell. After negotiations with the inmate failed, the officers entered the inmate's cell, restrained him, retrieved the cleaning supplies and left the cell. Clapper did not enter the inmate's cell. (Commission's Findings of Fact, Nos. 18–19.)

The inmate subsequently required medical treatment.[1] Later that morning, Lt. Hayes informed Clapper that a surveillance video tape indicated that an inmate's cell had been entered, and Hayes asked Clapper what had happened between 8:45 a.m. and 9:45 a.m. Clapper stated that nothing had happened between those times. (Commission's Findings of Fact, Nos. 21–22.) Lt. Hayes then questioned the four officers that had entered the cell and informed them of the surveillance video, again requesting information about what had happened between 8:45 a.m. and 9:45 a.m. The officers wrote incident reports; Clapper also wrote a report, stating that nothing had happened between those times. (Commission's Findings of Fact, Nos. 22–24.)

Lt. Hayes asked the officers and Clapper to amend their statements. At that time, Clapper amended his statement to read, "Let it be known that at no time did I enter the cell *at or before 0945*," and added a statement that he had no knowledge of anyone entering the inmate's cell.[2] (Commission's Findings of Fact, Nos. 27, 28) (emphasis added). On February 3, 2002, Clapper was told to report to Capt. Weaverling.

Capt. Weaverling asked Clapper if anyone had entered the inmate's cell between 8:45 a.m. and 9:45 a.m.; Clapper again denied that anything had happened during the time period in question. (Commission's Findings of Fact, Nos. 29–30.) On February 4, 2002, Clapper wrote another statement, admitting that the incident occurred at 8:30 a.m. and that "the decision to not mention this situation was a mutual agreement among those involved." Clapper accepted full responsibility for his actions, acknowledging that his decisions were "incorrect." (Commission's Findings of Fact, Nos. 31–33.)

Clapper was charged with nine violations of the Department's Code of Ethics and was terminated from his position. On appeal, the Commission concluded that the Department proved only three of the nine charges and, therefore, failed to establish just cause for termination. The Commission set aside Clapper's termination and suspended him for thirty days based on the three proven charges. Before this court, the Department argues that the Commission erred as a matter of law in altering the discipline imposed by the Department because Clapper's refusal to fully cooperate with an internal investigation and his untruthful and misleading state-

---

1. The record is not clear on the cause of the inmate's injuries or whether the four officers were responsible.

2. The Commission noted that the record contained no information about the other officers' amended reports.

ments during the investigation established Clapper's inability to satisfactorily perform his job duties and, thus, provided just cause for his dismissal. The majority rejects this argument, holding that the Commission acted within its authority in reinstating Clapper and modifying the Department's discipline to a suspension. In doing so, the majority dismisses our prior decisions in *Pennsylvania Game Commission v. State Civil Service Commission (Toth)*, 720 A.2d 1065 (Pa.Cmwlth.1998) *aff'd*, 561 Pa. 19, 747 A.2d 887 (2000) and *Department of Corrections v. Roche*, 654 A.2d 64 (Pa.Cmwlth.) *appeal denied*, 541 Pa. 644, 663 A.2d 695 (1995), distinguishing those cases because the underlying conduct was criminal in nature and not comparable to Clapper's conduct here. I cannot accept this reasoning.

At the outset, I submit that this court cannot ignore *Toth* and *Roche* solely on the basis that Clapper's conduct was not criminal and did not involve the physical mistreatment of inmates. Although the facts are different, the rationale in those cases remains applicable to the present situation. Neither *Toth* nor *Roche* was decided on the basis of whether the charged conduct was criminal or non-criminal in nature; rather, those cases focused on whether the employee's conduct touched upon the ability to perform his or her job.[3] As we

recently explained in *Davis v. Civil Service Commission*, 820 A.2d 874, 878 (Pa. Cmwlth.2003), "[e]ven a single instance of misconduct or an *error of judgment* can constitute just cause for dismissal if it adversely *reflects on the fitness of a person for his duties.*" *Id.* at 878 (emphasis added). This is the standard that must apply in every civil service termination case.

Section 807 of the Civil Service Act (Act), Act of August 5, 1941, P.L. 752, *as amended*, 71 P.S. § 741.807, states that civil servants may only be terminated for just cause. Although the Act does not define just cause, our supreme court has stated that just cause "must be merit-related and the criteria must touch upon [the employee's] competency and ability in some rational and logical manner." *Galant v. Department of Environmental Resources*, 534 Pa. 17, 20, 626 A.2d 496, 498 (1993). As noted, the Commission here admitted that Clapper's violations proved by the Department reflected on his ability to properly execute his duties as a corrections officer.[4] Nevertheless, because the Department failed to prove a majority of the charges, the majority here approves the Commission's determination that the Department failed to prove just cause for Clapper's termination. I submit that the majority's conclusion is legally flawed.

---

3. Indeed, I note our prior decisions in *Ellerbee–Pryer v. State Civil Service Commission*, 803 A.2d 249 (Pa.Cmwlth.2002), and *Department of Labor & Industry v. Civil Service Commission (Davis)*, 693 A.2d 634 (Pa.Cmwlth.) *appeal denied*, 550 Pa. 712, 705 A.2d 1312 (1997). In *Ellerbee–Pryer*, this court affirmed the Commission's decision to terminate a corrections officer for failure to comply with a substance abuse program because it affected the terms of her employment. In *L & I*, we vacated the Commission's order reinstating an employee because it determined that the Department of Labor and Industry (L & I) did not have just cause for terminating an employee that purposely destroyed paperwork critical to the operations of the L & I. Again,

our focus did not rest on *what* was charged, but *how* it affected the employee's ability to perform his or her duties.

4. As a corrections officer, Clapper had a "duty to prevent injustice," and at the very least, was required to "report abuses, and to do so promptly and truthfully." *Roche*, 654 A.2d. at 69. In *Roche*, we determined that a corrections officer's attempt to cover-up the criminal actions of fellow corrections officers by lying about what he observed constituted a dereliction of duty in a matter of public concern and *reflected upon his duties as an officer*. *Roche*.

Unlike the majority, I believe that Clapper's conduct was more than an example of "bad judgment." (Majority's op. at 532.) Clapper's actions constituted a serious dereliction of duty that raised significant questions as to his ability to perform as a corrections officer. Because Clapper's proven conduct "struck at the heart" of his ability to perform his duties, that conduct *justified termination as a matter of law.* *Toth,* 561 Pa. at 30, 747 A.2d at 893.

The majority also agreed that the Commission acted within its statutory authority in modifying the Department's discipline of Clapper. Although I recognize that the Commission has wide discretion under section 952(c) of the Act, *added by* the Act of June 26, 1989, P.L. 47, 71 P.S. 741.952(c), to modify the Department's action, I disagree with the majority's determination that the Commission acted within the boundaries of its statutory authority here. Section 952(c) allows the Commission to order reinstatement of an employee only "where appropriate." 71 P.S. § 741.952(c). Such modification is **not appropriate** here. Clapper's conduct is indefensible and touches upon his job performance at the most basic level.

Accordingly, I believe that the majority erred as a matter of law in affirming the discipline imposed by the Commission, and I would vacate the Commission's order and reinstate the discipline imposed by the Department.