747 A.2d 887

PENNSYLVANIA GAME COMMISSION

v.

STATE CIVIL SERVICE COMMISSION (TOTH).

**Appeal of Robert M. Toth.**

Supreme Court of Pennsylvania.

Argued Nov. 16, 1999.

Decided March 28, 2000.

Debra K. Wallet, Camp Hill, for Robert M. Toth.

Thomas W. Scott, Killian & Gephart, Harrisburg, for PA Game Com'n.

Frank A. Fisher, Chief Counsel, State Civil Service Com'n, for PA State Civil Service Com'n.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

### *OPINION*

CAPPY, Justice.

We granted allocatur to consider the standard of review utilized by the Commonwealth Court in reversing the order of the State Civil Service Commission (Civil Service Commission) and to determine whether reversal was appropriate. For the reasons that follow, we find that the result reached by the Commonwealth Court was correct. Thus, we affirm the order of the Commonwealth Court.[1]

A recitation of the somewhat lengthy facts underlying this appeal is necessary for a meaningful understanding of this matter. The Pennsylvania Game Commission (Game Commission) is an independent administrative commission under the executive branch and is governed by eight Game Commissioners who are appointed by the Governor. All Game Commission personnel, except for the Executive Director, are em-

---

1. This court may affirm the order of the court below if the result reached by the lower court is correct without regard to the grounds relied upon by that court. *Petrovick v. Department of Transportation,* 559 Pa. 614, 741 A.2d 1264, 1269 (1999); *E.J. McAleer & Co. v. Iceland Products, Inc.,* 475 Pa. 610, 381 A.2d 441, 443 n. 4 (1977).

ployed in accordance with the classification and compensation plans of the Commonwealth as set by the Office of Administration (OA). Appellant Robert M. Toth was named Chief of Personnel Services for the Game Commission in 1987. Ultimately, Toth was responsible for safeguarding the integrity of the Commonwealth's payroll system and ensuring that the policies of the Commonwealth were followed.

As Chief of Personnel Services, Toth reported directly to Kenneth Hess, Director of the Bureau of Administrative Services. In turn, Hess reported to Steven Williams who was the Deputy Executive Director of the Game Commission. Williams reported to the Executive Director of the Game Commission, Peter Duncan.

Toth's termination from his employment with the Game Commission was a result of actions taken by Toth surrounding a controversy over a systematic increase in pay called a "longevity increment." A longevity increment is an employee's advancement to the next step on a pay scale as a result of the passage of a certain period of time. In April 1991, the OA amended personnel rules applicable to all agencies under the Governor's jurisdiction, including the Game Commission. Pursuant to the amendments, any employee hired after July 1, 1988 was required to work seven years before receiving a longevity increment. Prior to the amendments, an employee was entitled to receive a longevity increment after only one year of service.

Toth's immediate supervisor, Hess, was not pleased with the alteration to the longevity increment. He told Toth to "look into it, see if there is anything we could do." In January 1993, Toth became privy to information that the Pennsylvania Fish and Boat Commission (Fish Commission) was able to change the time it took to obtain an initial longevity increment to one year by placing an incorrect longevity date into the payroll computer system. Toth took his newfound information and informed Hess of what the Fish Commission was doing. Hess asked Toth to investigate further and to see if it were possible for the Game Commission to do the same for its employees. Toth directed an assistant in his division, Pamela Klinger, to

obtain information from the Fish Commission as to how it was making the changes to the payroll system which reduced the time for employees to receive an initial longevity increment. Subsequently, Toth was informed as to how the Game Commission could change the initial increment to one year in the computer system.

Toth informed Williams, Hess' immediate supervisor, about how to alter the longevity increment in the computer by changing an employee's longevity date. Williams told Toth to change his (Williams') longevity increment. Toth volunteered that they do the same for Jane Peyton, a Personnel Analyst 2 employed in Toth's division. Both Williams and Peyton had been hired after 1988. These changes were envisioned as "test cases" to determine the feasibility of reducing the initial longevity increment for other Game Commission employees who would be affected by the policy changes enacted by the OA. Thus, Toth directed that Peyton's longevity date be altered from September 5, 1996 to March 1, 1993. Additionally, William's longevity date was changed from February 10, 1999 to March 1, 1993. As a result of these changes, both Willams and Peyton received an increase in pay. Subsequently, Toth informed Hess of the actions that he had taken; Hess voiced no objection to these changes and spoke about altering other employee's longevity dates if the changes were successful.

In the spring of 1993, Greg Matthews, a pay specialist for the OA, found the alteration of Peyton's longevity increment and determined that the change was inappropriate. Matthews'. supervisor conducted an investigation of other personnel records and noted that Williams' longevity date was also changed. Charles Sciotto, Deputy Secretary for the OA, telephoned Toth and informed Toth that the longevity dates would have to be changed back to their original status and that Williams and Peyton would have to make restitution for the improper increases that they received. Toth admitted to Sciotto that it was a mistake to alter the payroll records and that he knew it was the wrong thing to do.

Upon Hess' retirement in July 1994, Hess wrote to the Game Commissioners discussing the altered dates and Toth's role in the scheme. While attending an October 1994 Game Commissioner meeting, Toth admitted that he altered the payroll records but contended that he did so with the approval of Williams and Hess. At this point, the matter was turned over to the Office of the Inspector General. The Inspector General concluded its investigation and offered a report to the Game Commissioners which was the subject of discussion at a January 1995 meeting of the Commissioners. The Inspector General's report concluded, *inter alia*, that Toth had acted improperly and had possibly violated the Crimes Code.

Following these events, Williams was terminated. The Commissioners also sent a letter to Toth informing him that he was suspended pending a January 20, 1995 pre-disciplinary conference. On January 23, 1995, Toth was terminated for "directing that payroll records be changed without justification." The letter informing Toth of his dismissal further stated that Toth may have violated the Crimes Code and that his conduct brought discredit to the Game Commission.[2]

Toth appealed his termination to the Civil Service Commission.[3] At his hearing before the Civil Service Commission, Toth maintained that he was only following the direction of Williams and Hess, and therefore, his actions were not "without justification." In support of his position, Toth contended that he was authorized by his superiors to change the personnel records. Furthermore, Toth argued that the personnel policies of the Game Commission permitted him to make the alterations and that the Fish Commission had similar policies that authorized that administrative commission to change the

2. Criminal charges were not pending at the time of his dismissal. However, Toth was later charged with unlawful use of a computer in violation of 18 Pa.C.S.A. § 3933(a)(2), a misdemeanor of the first degree. Toth was accepted into the Accelerated Rehabilitation Disposition program on this charge.

3. Harry Benion, the individual who, as of 1996, had been selected to fill the position previously held by Toth, was given the opportunity to participate in the hearing before the Civil Service Commission as an indispensable party.

longevity increment for its employees.[4]  Finally, Toth asserted that it was Game Commission policy not to follow dictates of the OA. He cited to two previous incidents in which Hess directed him to ignore mandates from the OA and to implement what was considered Game Commission policy.[5]

The Civil Service Commission found that because Toth admitted to directing his subordinate to perform alterations to the payroll computer system to change the longevity dates, the case turned on whether he was justified in doing so.  The Civil Service Commission concluded that because Toth's actions were at the direction of his supervisors, Toth did not act without justification.  According to the Civil Service Commission, further justifying Toth's actions was the history of noncompliance within the Game Commission.  Thus, the Civil Service Commission determined that the Game Commission failed to establish just cause for termination.

However, the Civil Service Commission went on to note that Toth was responsible for safeguarding the Commonwealth's payroll system and ensuring that the personnel policies of the Commonwealth were followed.  The Civil Service Commission went so far as to note that Toth had exhibited "exceptionally poor judgment" and that Toth should have been particularly cautious since Williams had only been the Deputy Executive Director for one year and that Williams would personally benefit from the changes to the longevity dates.  Finally, the Commission suggested that Toth should have used better

**4.** The Fish Commission is also an independent administrative commission.  However, in contrast to the Game Commission, apparently, the executive director of the Fish Commission is granted the authority to appoint and to fix the compensation of all Fish Commission employees.  *See* 30 Pa.C.S. § 304(a).

**5.** In 1989, Hess ordered Toth to place Game Commission employees on a 40 hour week instead of a 37½ hour week.  The OA denied Toth's request to make the alteration.  The Game Commission refused to switch its employees back to a 37½ hour week.  Ultimately, the Game Commission reached an agreement with the OA in which it would switch its employees back to a 37½ hour week but the employees would retain the same compensation that they had received on the 40 hour schedule.  In a second incident, Hess directed Toth to pay the salary of an employee who had returned to graduate studies despite the refusal of the OA to approve the arrangement.

judgment and sought more direct authority from the Game Commissioners themselves rather than rely on any approval from Williams or Hess. Ultimately, the Civil Service Commission ordered Toth reinstated but without back pay.

. The Game Commission appealed to the Commonwealth Court. By order dated October 23, 1998, the Commonwealth Court reversed the order of the Civil Service Commission. On June 22, 1999, we granted Toth's petition for allowance of appeal.

The threshold issue before the court is whether the Commonwealth Court stated and utilized the appropriate standard of review in its consideration of the Civil Service Commission's award. The Commonwealth Court articulated its standard of review as determining "whether the Commission committed an error of law, abused its discretion or found facts that were not supported by substantial evidence." *Pennsylvania Game Commission v. State Civil Service Commission (Toth),* 720 A.2d 1065, 1067–68 (Pa.Cmwlth.1998). In support of this standard, the Commonwealth Court cited two Commonwealth Court opinions, *Metrick v. State Civil Service Commission,* 687 A.2d 26 (Pa.Cmwlth.1996) and *Balas v. Department of Public Welfare,* 128 Pa.Cmwlth. 205, 563 A.2d 219 (1989).

■ In 1997, in *Bowman v. Department of Environmental Resources,* 549 Pa. 65, 700 A.2d 427 (1997), our court set forth the appropriate standard of review for an appellate court reviewing a Civil Service Commission adjudication. "The standard of review involving agency adjudications is limited to a determination of whether constitutional rights have been violated, errors of law have been committed, or whether the findings of the agency are supported by substantial evidence." 700 A.2d at 428. Consistent with 2 Pa.C.S. § 704, we add that the standard also involves, where appropriate, consideration of the regularity of the practice and procedure of the Commonwealth agency.

While the standard stated by the Commonwealth Court is similar to that set forth in *Bowman* and § 704, it is not a full, or perhaps entirely clear, articulation of the appropriate stan-

dard.[6] For sake of completeness, clarity, and consistency, we reaffirm the well-traveled standard of review of an administrative agency decision and hold that an appellate court's review of a Civil Service Commission determination is the standard enunciated in *Bowman* and § 704.[7, 8, 9]

6. We note that this court has indicated that appellate review of whether an agency decision is in accordance with law may include, as a component, consideration of whether the agency's determination represents an abuse of discretion. *Fraternal Order of Police v. PLRB*, 557 Pa. 586, 735 A.2d 96, 99 (1999).

7. Additionally, in *applying* its stated standard of review, the Commonwealth Court analogized its limited role to that of appellate court reviewing an Act 195 labor arbitration award. In reviewing an Act 195 arbitration award, appellate courts apply what has come to be called the "essence test." In this case, the Commonwealth Court's statement of the essence test included a determination of whether the Civil Service Commission's award was "manifestly unreasonable." First, we desire to make clear that the appropriate standard of review of the Civil Service Commission is that stated in *Bowman* and § 704 and not the essence test. Analogy to a court's review of an Act 195 labor arbitration award unnecessarily clouds the proper focus of appellate review. Furthermore, in rendering its decision, the Commonwealth Court did not have the benefit of this court's recent decision which traced the history of and defined the essence test, *State System of Higher Education (Cheyney University) v. State College and University Professional Association*, 560 Pa. 135, 743 A.2d 405, 199 Pa. LEXIS 3783 (1999). In *State System* a majority of our court specifically determined that a standard based upon reasonableness ("reasonable interpretation" and "manifestly unreasonable") was inappropriate and lacking in the deference necessary to uphold the policy goals of binding arbitration. While in his concurring and dissenting opinion, Justice Castille indicated that he would go farther and allow the court to review whether an arbitration award was "manifestly unreasonable" under the essence test, this concurring view had no joinders. Thus, we reiterate that the essence test does not permit an appellate court to intrude into the domain of the arbitrator and determine whether an award is "manifestly unreasonable." While reasonableness is an improper focus in the context of a review of an Act 195 labor arbitration award, in the context of a review of an administrative agency decision, our court has noted that while a reviewing court is not to invoke a concept of reasonableness as justification to simply substitute its judgment for that of an agency, it remains within the purview of an appellate court to determine whether any reasonable mind could make the same determination as the agency based upon the evidence. *Fraternal Order of Police*, 735 A.2d at 100. Thus, although this basis was not articulated, the Commonwealth Court's use of the concept of reasonableness was not wholly without foundation.

8. To the extent that other Commonwealth Court decisions have adopted the essence test as the appropriate standard of review of a Civil Service

Having clarified the appropriate standard of review, we could remand the case for consideration by the Commonwealth Court in light of our opinion. However, because the standard of review is a reaffirmation of the standard set forth in *Bowman*, and because the parties have assisted our court by briefing the issue, for purposes of judicial economy, we will consider whether reversal of the Civil Service Commission's determination reinstating Toth to his position was proper.

Civil servants may only be terminated for "just cause." 71 P.S. § 741.807. Although not defined in the Civil Service Act, our court has indicated that just cause "must be merit-related and the criteria must touch upon competency and ability in some rational and logical manner." *Galant v. Department of Environmental Resources*, 534 Pa. 17, 626 A.2d 496, 497 (1993). Thus, the ultimate issue before us is whether Toth was terminated for just cause.

In this case, the Civil Service Commission first considered whether the allegations of misconduct occurred. Here, the factual allegations regarding Toth's alteration of the payroll system were admitted. Thus, the inquiry became whether the falsification of records was justified.

The Civil Service Commission held that the Game Commission failed to establish that the payroll records were changed without justification. As noted above, Toth argued before the Civil Service Commission that he was not without justification for three reasons: first, he had authorization for his acts from his superiors; second, Game Commission policies authorized the change to the system; and finally, the atmosphere at the Game Commission was one of non-conformity with OA personnel policies. The Civil Service Commission, in reinstating Toth, relied primarily on its finding that Toth acted with justification in altering payroll records because he had autho-

Commission decision, they are hereby rejected. *See e.g., State Correctional Institution at Graterford, Department of Corrections, v. State Civil Service Commission (Terra)*, 718 A.2d 403 (Pa.Cmwlth.1998).

9. As in this case the focus is upon whether the Civil Service Commission erred as a matter of law, our scope of review is plenary. *Phillips v. A–Best Products Co.*, 542 Pa. 124, 665 A.2d 1167, 1170 (1995).

rization from his superiors for his acts. It also pointed to the Game Commission's history of not following the OA's directives.

We find that the Civil Service erred as a matter of law, under the facts in this case, when it found justification for Toth's admittedly wrongful actions in altering the very payroll system whose integrity he was charged with protecting. The "justifications" found by the Civil Service Commission should have been rejected as a matter of law.

Toth asserted, and the Civil Service Commission accepted as its primary reason for reinstatement, that Toth had his supervisors' approval for the alteration of the payroll system. However, as found by the Civil Service Commission, as Chief of Personnel Services Division, Toth's duties included "safeguarding the Commonwealth's payroll system." Finding of Fact No. 6. Moreover, Toth was charged with ensuring that the policies of the Commonwealth were followed. Given Toth's managerial position of import, whose primary function was to act as guardian of the payroll records, there cannot be justification for the admittedly wrongful, willful, and intentional alteration of those same records. Toth conceded that he knew his actions were a "mistake" and that he was "wrong." Changing of the payroll records was not from a lack of knowledge. We find that a public employee in a position of trust and oversight, especially where the position involves disbursement of public funds, cannot blindly follow orders which he knows or should know violates the law. "I was just following orders" does not operate as a legal justification when one is in a position of oversight and responsibility such as that held by Toth. *See Geissler v. Board of Commissioners of Upper Dublin Township*, 76 Pa.Cmwlth. 426, 463 A.2d 1284 (1983); *Benvignati v. State Civil Service Commission*, 106 Pa.Cmwlth. 643, 527 A.2d 1074 (1987).[10, 11]

10. We note that the Whistleblower Law is specifically designed to protect employees from adverse employment actions when making a good faith report regarding an instance of wrongdoing or waste. 43 P.S. § 1421 *et seq.*

11. Toth also asserted that his actions were justified because he believed that altering the payroll records was consistent with Game Commission

In sum, the Civil Service Commission's decision finding "justification" for Toth's conduct is erroneous as a matter of law. The facts presented and found by the Civil Service Commission simply do not support the legal conclusions reached by the Civil Service Commission that there was no just cause for Toth's termination. Toth's primary responsibility was safeguarding the Commonwealth's payroll files. Instead, he used his position to direct subordinates to override the Commonwealth's payroll system and to corrupt those files. This was egregious misconduct that struck at the heart of the ability of Toth to perform his duties. It justified termination as a matter of law. *See Department of Labor and Industry v. State Civil Service Commission (Davis),* 693 A.2d 634 (Pa. Cmwlth.1997); *Department of Community Affairs v. Averette,* 104 Pa.Cmwlth. 260, 521 A.2d 534 (1987); *Office of Attorney General v. Colbert,* 142 Pa.Cmwlth. 657, 598 A.2d 344 (1991).

Having determined that the Commission erred in failing to find just cause for the Game Commission's actions, we must still consider whether modification of Toth's termination was appropriate. The Civil Service Commission has been given some discretion by the General Assembly to modify a penalty imposed by an agency. In 1989, the General Assembly amended the Civil Service Act to grant to the Civil Service Commission the statutory authority to vary or set aside the action of the of the employing governmental agency. *"Where appropriate,* the commission may order reinstatement, with the payment of so much of the salary or wages lost, including

policies and that the Game Commission had a history of not following OA directives. As to Game Commission policies, it is sufficient to note that upon discovery by the OA of the changes to payroll records, Toth admitted to OA Deputy Secretary Sciotto that he knew his attempt to alter the records was "wrong" and that Toth corrected the records without challenge to the OA. Toth's argument is nothing more than a post hoc rationalization for his misconduct. Furthermore, the Civil Service Commission's finding that there existed a "general atmosphere of antagonism" towards the OA's personnel policies is equally unavailing to Toth. Contrary to the previously described incidents which involved above-the-board policy disputes with OA, in this instance, Toth and other equally unauthorized Game Commission employees unilaterally altered payroll records in an attempt to secure an unapproved increase in pay. These unrelated incidents provide no safe harbor for Toth's outlandish conduct.

employe benefits, as the commission may in its discretion award." 71 P.S. § 741.952 (emphasis supplied).

Toth offers that this amendment to the Civil Service Act authorized the Civil Service Commission to modify Toth's termination to a suspension. In essence, Toth suggests that the Civil Service Commission has boundless authority over the imposition of discipline. This position is without merit. First, as noted above, Civil Service Commission determinations are subject to review by appellate courts for, *inter alia*, errors of law. Second, such an interpretation of the Civil Service Commission's authority reads out of the relevant statutory provision the limiting language "where appropriate," which qualifies otherwise limitless action by the Civil Service Commission.

■■ While this court has indicated that the Civil Service Commission may modify the action of an appointing agency "even where the charges brought against the employee are proven," *Galant*, 626 A.2d at 498, we hold that the Civil Service Commission's ability to alter an agency's employment action is not without boundaries. In light of the position held by Toth, the unjustified acts he committed, and just cause for his termination, the Civil Service Commission was without a basis to modify the Game Commission's decision to terminate Toth. Simply stated, this is not an appropriate situation to modify the Game Commission's action. In this case, the proven and admitted misconduct constituted a serious dereliction of duty and directly impacted upon Toth's ability to perform in his position. By the Civil Service Commission's own findings, just cause for dismissal was established and modification was not appropriate.

We find that under the circumstances in this case, Toth's intentional alteration of payroll records, as Chief of Personnel Services, constitutes just cause for dismissal and that the Civil Service Commission erred as a matter of law by reinstating Toth. The order of the Commonwealth Court is hereby affirmed.