# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Pennsylvania State Police,      :
             Petitioner      :
             :
       v.           :   No. 858 C.D. 2015
             :   Submitted: January 22, 2016
Nathan Slaughter,        :
             Respondent     :


BEFORE:    HONORABLE ROBERT SIMPSON, Judge
              HONORABLE MICHAEL H. WOJCIK, Judge
              HONORABLE DAN PELLEGRINI, Senior Judge


**OPINION**
**BY JUDGE SIMPSON**           **FILED: March 21, 2016**


In this appeal, the Pennsylvania State Police (PSP) asks whether an Administrative Law Judge (ALJ) in the Office of Attorney General (OAG) erred in ordering the PSP to remove from the Pennsylvania Instant Check System (PICS) database, as it pertains to Nathan Slaughter (Slaughter),[1] the disability imposed by Section 6105(c)(4) of the Uniform Firearms Act (UFA), 18 Pa. C.S. §6105(c)(4) (generally stating that an individual who has been involuntarily committed to a mental institution for inpatient care and treatment under Sections 302, 303 or 304 of the Mental Health Procedures Act[2] (MHPA), may not possess a firearm). The PSP asserts the ALJ erred in determining it did not sustain its burden of proof in denying Slaughter a firearms purchase when Slaughter was prohibited from possessing firearms based on a prior involuntary commitment under Section 302 of

---

[1] No party sought to amend the caption to use only Slaughter's initials. Indeed, in his filings in this case, Slaughter refers to himself by name.

[2] Act of July 9, 1976, P.L. 817, as amended, 50 P.S. §§7302, 7303, 7304.

the MHPA. It also argues that the order of a court in Virginia that purportedly restored Slaughter's right to possess a firearm is unenforceable and is not entitled to full faith and credit in Pennsylvania. Upon review, we reverse.

## I. Background

In March 2014, Slaughter attempted to purchase a firearm. He was prohibited from doing so after a search of the PICS database revealed that he was disqualified from owning or possessing a firearm. Slaughter filed a PICS challenge. Among other things, the challenge form asks: "Were you ever adjudicated incompetent or involuntarily committed?" Certified Record (C.R.), Item #6, ALJ's Hearing, 10/22/14, Ex. A at 2. In response to this question, Slaughter stated "unknown see attached[,]" and he attached a document titled "Mental Health Record" that indicated he was subject to an "[i]nvoluntary [c]ommittal" at Temple University Hospital in Philadelphia. C.R., Ex. A at 2, 6. The PSP subsequently denied Slaughter's PICS challenge pursuant to Section 6105(c)(4) of the UFA based on a 2005 involuntary commitment.[3] Slaughter appealed to the OAG. A hearing ensued before an ALJ.

At the hearing, the PSP presented the testimony of Stephanie Dunkerly (Dunkerly), a legal assistant supervisor in the PSP's PICS Challenge Section, as well as the telephonic testimony of Regina Mary O'Neill (O'Neill), Deputy City Solicitor for the City of Philadelphia, Counsel for the Department of Behavioral Health and Intellectual Disability Services. The PSP also presented a

---

[3] The PSP also stated that federal law restricts any person adjudicated as a mental defective or involuntarily committed to any mental institution. 18 U.S.C. §922(g)(4). The ALJ did not address this provision in his decision; rather, he decided this case solely on state law.

2

packet of documents relating to Slaughter's PICS challenge, which included, among other things, mental health records from the Philadelphia Department of Behavioral Health and Intellectual Disability Services as well as a petition to extend the length of Slaughter's involuntary treatment, which was filed in the Court of Common Pleas of Philadelphia County. Slaughter testified on his own behalf and presented documentary evidence, including letters from O'Neill and Temple University Hospital regarding the results of their searches for additional records relating to Slaughter.

Dunkerly testified she processed Slaughter's PICS challenge, and she prepared a packet of documents relating to the PICS challenge in preparation for the hearing. Within that packet, was an Act 77[4] notification form the PSP received regarding Slaughter, which indicated that in October 2005, Slaughter was involuntarily committed at the Temple University Hospital, Episcopal Campus. Dunkerly also identified certified records pertaining to Slaughter from the Philadelphia Department of Behavioral Health and Intellectual Disability Services, which indicated Slaughter was committed pursuant to Section 302 of the MHPA. Dunkerly also identified a petition for a commitment under Section 303 of the MHPA, together with an order scheduling a hearing, through which a request was made to extend Slaughter's involuntary commitment. That document indicated Slaughter was informed of his rights and an examination occurred. Dunkerly also

---

[4] Act 77 refers to the Act of July 2, 1996, P.L. 481, No. 77, which amended the MHPA to require, among other things, judges of the common pleas courts, mental health review officers and county mental health and mental retardation administrators to notify the PSP on a form developed by the PSP of the identity of any individual who is adjudicated incompetent or who is involuntarily committed to a mental institution for inpatient care and treatment under the MHPA or who was involuntarily treated as described under 18 Pa. C.S. §6105(c)(4).

identified an order from the Court of Common Pleas of Philadelphia County, which stated the petition filed pursuant to Section 303 of the MHPA was withdrawn, without prejudice, after Slaughter agreed to a voluntary commitment under Section 201 of the MHPA.

On cross-examination, Dunkerly acknowledged the packet of documents did not contain a copy of the actual petition completed pursuant to Section 302 of the MHPA. Additionally, Dunkerly identified a letter from O'Neill to Slaughter's counsel, which indicated that, in response to Slaughter's counsel's request for a copy of the 302 petition, O'Neill was only able to locate the 303 petition, which was withdrawn after Slaughter agreed to be voluntarily committed. Dunkerly also identified a document from Temple University's Medical Records Department, which indicated there was no record of Slaughter being seen at Temple University Hospital. Also, she identified a document from Temple University Health System, Episcopal Campus, which indicated it was unable to answer a records request because the records sought were beyond its retention policy of seven years and records older than seven years old were destroyed.

For her part, O'Neill testified that she was unable to locate any records for Slaughter other than the records from the Court of Common Pleas of Philadelphia County, which consisted of a copy of the petition filed pursuant to Section 303 of the MHPA, and the order marking the petition withdrawn after Slaughter agreed to a voluntary commitment. O'Neill testified that, based on her experience, a Section 303 petition would not be filed unless a prior petition under Section 302 was filed. Based on the documents she was able to locate, O'Neill

4

explained that, after the Section 303 petition was filed, Slaughter agreed to remain at the facility voluntarily.

On cross-examination, O'Neill testified she could not locate a copy of the Section 302 petition, but the petition was beyond the seven-year period in which such records would be retained. O'Neill also explained that, unlike a Section 303 proceeding, which requires a court hearing, a 302 petition is completed by a physician at a hospital and is provided to the delegate of a county mental health department. O'Neill also explained that if an individual voluntarily seeks psychiatric help at a hospital and later wishes to leave, the hospital can involuntarily commit that individual for further evaluation for up to 120 hours by filing a Section 302 petition.

For his part, Slaughter testified that his family currently resides in Richmond, Virginia. Slaughter explained that in 2005 he was 22 years old and living in Philadelphia. He indicated that in October 2005 he was in a difficult place in his life, and on the date at issue, "[he] had a lot to drink and [he] made a suboptimal decision." C.R., Item #6, ALJ's Hearing, 10/22/14, Notes of Testimony (N.T.) at 89. Realizing he made a mistake, he dialed 911 and asked for help, and emergency medical technicians transported him by ambulance to Temple University Hospital where he received treatment. Sometime later, he recalled being in a room where individuals sitting across from him asked if he wanted "continued emotional mental treatment." N.T. at 90. He indicated that he wanted such treatment, and he remained at the facility for a period of time.

5

On cross-examination, Slaughter indicated that he has alcoholism. He stated that on the date at issue, in addition to consuming a lot of alcohol, he ingested a handful of aspirin. He testified he vaguely remembered being transferred from one hospital to another hospital as well as meeting with a public defender. Slaughter also indicated he vaguely recalled meeting with a mental health review officer. At that time, he indicated he wished to undergo further psychiatric treatment. When asked if the incident was a suicide attempt, Slaughter responded he "would call it a cry for help from a very lost, scared young man …." N.T. at 100.

On re-direct examination, Slaughter identified a document issued by the Henrico General District Court in Virginia, which restored his right to purchase, possess or transfer a firearm in Virginia. As to the 2005 incident in Philadelphia, Slaughter testified he did not recall being informed of the rights of a person subject to a Section 302 petition. He further testified he was not informed he was being involuntarily committed, and he did not communicate to hospital personnel that he was not there voluntarily.

On re-cross examination, Slaughter explained that after he unsuccessfully attempted to purchase a firearm in Virginia, he was arrested and charged with unlawfully attempting to do so, based on the involuntary commitment in Philadelphia in 2005. He testified that because the underlying document showing he was involuntarily committed was never produced, the charges were dismissed with prejudice. Slaughter testified he subsequently filed an unopposed petition to restore his right to possess a firearm in Virginia, which was granted.

After the hearing, the parties filed briefs in support of their respective positions. Ultimately, the ALJ issued the following order:

> **AND NOW THIS** 15th day of May 2015, having heard the appeal of [Slaughter], reviewing the briefs of counsel and applying applicable case law to the denial of relief by the [PSP], dated April 21, 2014 the request of [Slaughter] for Relief is hereby **SUSTAINED.** [PSP] is hereby ordered to amend the PICS database within 30 days so as to remove, as it pertains to [Slaughter], the disability imposed by Subsection (c)(4) of Section 6105, 18 Pa. C.S. [§]6105 (c)(4). A petition for review of this decision in Commonwealth Court must be filed within 30 days of the date of this order.

C.R., Item #10. The PSP filed a petition for review to this Court.

Slaughter subsequently filed an application for remand on the ground the ALJ did not issue a written decision containing findings of fact and a statement of reasons for his decision. The PSP filed an answer in which it did not object to the requested remand. As a result, the undersigned issued an order remanding the matter to the ALJ for preparation of an opinion containing findings and reasons for the ALJ's order. We directed the ALJ to re-certify the record with the opinion, and we retained jurisdiction.

Thereafter, the ALJ issued an opinion in which he determined the PSP did not meet its burden of proving Slaughter was properly denied the right to purchase a firearm. In particular, the ALJ determined the PSP did not present the certification of an examining physician to show inpatient care was necessary or that Slaughter was committable. The ALJ also stated that, based on this determination, it was unnecessary for him to address Slaughter's argument that he

7

is entitled to the full faith and credit of the Henrico General District Court order, Henrico County, Virginia, which restored Slaughter's right to purchase, possess or transport a firearm in Virginia. This matter is now before us for disposition.

## II. Issues

On appeal,[5] the PSP argues the ALJ erred in determining that the PSP did not sustain its burden of proof in denying Slaughter the purchase of a firearm where Slaughter was prohibited from possessing firearms based on an involuntary commitment under Section 302 of the MHPA. Additionally, the PSP asserts the Virginia court order purporting to restore Slaughter's right to possess firearms is not enforceable and is not entitled to full faith and credit in Pennsylvania.

## III. Discussion
### A. Prohibition Under Section 6105(c)(4) of the UFA
### 1. Contentions

The PSP first argues the records presented at the hearing established by a preponderance of the evidence that the PSP properly denied Slaughter's purchase of a firearm based on his commitment under Section 302 of the MHPA. It asserts the records from the Philadelphia Department of Behavioral Health and Intellectual Disability Services revealed: (1) Slaughter was committed pursuant to Section 302 of the MHPA on October 3, 2005; (2) the initial exam facility was

---

[5] "On appellate review, we will affirm the decision of an administrative agency unless constitutional rights were violated, an error of law was committed, the procedure before the agency was contrary to statute, or any finding of fact made by the agency and necessary to support its adjudication is unsupported by substantial evidence." D'Alessandro v. Pa. State Police, 937 A.2d 404, 409 (Pa. 2007) (citing Section 704 of the Administrative Agency Law (AAL), 2 Pa. C.S. §704; Pa. Game Comm'n v. State Civil Serv. Comm'n (Toth), 747 A.2d 887 (Pa. 2000)).

8

Temple University Hospital; (3) the individual who petitioned for the commitment was Sean Lehman, M.D.; and, (4) the person committed bears the same last name, date of birth and Social Security Number as stated on Slaughter's PICS challenge form. C.R., Item #6, Ex. A at 11-12. The PSP contends the documents also indicated the reason for the commitment was a suicide attempt: "22YO male states he is having problems. He took a large quantity of aspirin in a suicide attempt. PT has a large aspirin level in his blood." Id. at 12. Slaughter corroborated this information at the hearing.

The PSP further maintains the Philadelphia County Court of Common Pleas records presented at the hearing established that Slaughter was involuntarily committed. The records indicated the Chief Medical Officer at the Temple University Hospital, Episcopal Campus, petitioned the court to extend Slaughter's treatment pursuant to Section 303 of the MHPA. Id. at 17-20. The PSP argues the request for certification states that Slaughter was already committed under Section 302 of the MHPA, and after further examination, he was found to be in need of continued treatment. The PSP asserts there could not have been a Section 303 proceeding without a prior Section 302 commitment under the MHPA.

Slaughter responds that the PSP did not–and cannot–prove a firearms disability under Pennsylvania law because it did not–and cannot–produce what does not exist: the required certification from a physician that Slaughter was involuntarily committed. Slaughter argues that the PSP deliberately chose not to require the necessary form as part of its records. Recognizing that this failure is fatally defective to its claim that Slaughter suffers a firearms disability, Slaughter

9

asserts, the PSP attempts to make an end-run around the law by using other documents to justify rank speculation about what happened over a decade ago. Slaughter contends this attempt fails for several reasons.

First, he argues the PSP asserts the wrong burden of proof. The PSP's burden of proof here is clear and convincing evidence, not a mere preponderance. Additionally, Slaughter maintains, the PSP's position is impermissible under Pennsylvania law, which requires certain specific forms and statements within those forms, and which does not permit any deviation. Further, Slaughter contends, the documents relied on by the PSP are inherently unreliable and lack credibility because they are incomplete and rife with errors and inconsistencies. Finally, he argues, permitting the PSP to impose a firearms disability on such flawed proof violates his constitutional rights to bear arms and to due process. For these reasons, Slaughter asserts this Court should affirm the ALJ's determination.

The PSP rejoins that Slaughter's assertion that the PSP could not prove the existence of a Section 302 certification by way of extrinsic evidence is misplaced. First, Section 505 of the Administrative Agency Law allows the PSP to introduce all relevant evidence so long as it has probative value. 2 Pa. C.S. §505 ("Commonwealth agencies shall not be bound by technical rules of evidence at agency hearings, and all relevant evidence of reasonably probative value may be received. …") Consistent with this statutory provision, the PSP maintains, it presented documents and testimony, all of which had probative value in determining whether Slaughter was involuntarily committed by way of a doctor's certification pursuant to 18 Pa. C.S. §6105(c)(4). Additionally, the PSP argues, in

a recent, unreported opinion, this Court acknowledged that the PSP could meet its burden of proving a prohibition under 18 Pa. C.S. §6105(c)(4) through the use of circumstantial evidence.  See Brandon v. Pa. State Police (Pa. Cmwlth., No. 841 C.D. 2015, filed November 24, 2015), 2015 WL 7458905 (unreported).[6]

## 2. Analysis

With regard to challenges to the records maintained by the PSP, Section 6111.1(e) of the UFA states:

**(e) Challenge to records.--**

> (1) Any person who is denied the right to receive, sell, transfer, possess, carry, manufacture or purchase a firearm as a result of the procedures established by this section may challenge the accuracy of that person's … mental health record pursuant to a denial by the instantaneous records check by submitting a challenge to the [PSP] within 30 days from the date of the denial.
>
> (2) The [PSP] shall conduct a review of the accuracy of the information forming the basis for the denial and shall have the burden of proving the accuracy of the record. …
>
> (3) If the challenge is ruled invalid, the person shall have the right to appeal the decision to the Attorney General within 30 days of the decision.  The Attorney General shall conduct a hearing de novo in accordance with the Administrative Agency Law.  The burden of proof shall be upon the Commonwealth.
>
> (4) The decision of the Attorney General may be appealed to the Commonwealth Court by an aggrieved party.

---

[6] Pursuant to Commonwealth Court Internal Operating Procedure 414, 210 Pa. Code §69.414, an unreported panel decision of this Court, issued after January 15, 2008, may be cited for its persuasive value.

11

18 Pa. C.S. §6111.1(e).

Further, Section 6105 of the UFA provides, in relevant part (with emphasis added):

**(a) Offense defined.—**

(1) A person … whose conduct meets the criteria in subsection (c) shall not possess, use, control, sell, transfer or manufacture or obtain a license to possess, use, control, sell, transfer or manufacture a firearm in this Commonwealth.

\* \* \* \*

**(c) Other persons.—**In addition to any person who has been convicted of any offense listed under subsection (b), the following persons shall be subject to the prohibition of subsection (a):

\* \* \* \*

(4) A person who has been adjudicated as an incompetent or who has been involuntarily committed to a mental institution for inpatient care and treatment under section 302, 303 or 304 of the provisions of the act of July 9, 1976 (P.L. 817, No. 143), known as the [MHPA]. This paragraph shall not apply to any proceeding under section 302 of the [MHPA] unless the examining physician has issued a certification that inpatient care was necessary or that the person was committable.

18 Pa. C.S. §6105(a)(1), (c)(4).

Generally, under Section 302 of the MHPA, an emergency mental examination of a patient may be undertaken where a physician certifies an examination is needed or an authorized county administrator approves a warrant for examination. R.H.S. v. Allegheny Cnty. Dep't of Human Servs., Office of

12

Mental Health, 936 A.2d 1218 (Pa. Cmwlth. 2007) (citing 50 P.S. §7302). A patient must be examined within two hours after arrival at a treatment facility. Id. If the examination reveals the patient needs treatment, it must begin immediately. Id. If treatment is not necessary, the patient must be discharged. Id. In any event, the patient must be discharged within 120 hours unless it is determined further treatment is necessary or the patient voluntarily seeks additional treatment. Id. Additionally, under Section 303(a) of the MHPA ("**Persons Subject to Extended Involuntary Emergency Treatment**"), an application for extended involuntary emergency treatment "may be made for any person who is being treated pursuant to section 302 whenever the facility determines that the need for emergency treatment is likely to extend beyond 120 hours." 50 P.S. §7303(a) (emphasis added).

Section 6105(c)(4) of the UFA prohibits a person who was involuntarily committed to a mental institution for inpatient care and treatment under Section 302 of the MHPA from, among other things, possessing a firearm. 18 Pa. C.S. §6105(c)(4). This prohibition does not apply to any proceeding under Section 302 unless the examining physician issued a certification that inpatient care was necessary or that the person was committable. Id. However, the plain language of Section 6105(c)(4) of the UFA does not require submission of the actual examining physician's certification. Brandon.[7] Rather, the PSP can meet its

_____

[7] Although Slaughter repeatedly asserts the PSP was required to produce the actual examining physician's certification under Section 302 of the MHPA, the plain language of 18 Pa. C.S. §6105(c)(4) does not impose such a requirement. See Brandon v. Pa. State Police (Pa. Cmwlth., No. 841 C.D. 2015, filed November 24, 2015), 2015 WL 7458905 (unreported). In any event, as discussed more fully below, the PSP presented an examining physician's certification that *extended* inpatient care was necessary in the Application for Extended **(Footnote continued on next page…)**

13

burden of proof through the presentation of circumstantial evidence. Id.; see e.g., A.B. v. Slippery Rock Area Sch. Dist., 906 A.2d 674 (Pa. Cmwlth. 2006). In A.B., this Court explained:

> Circumstantial evidence has been defined as 'evidence of one fact, or of a set of facts, from which the existence of the fact to be determined may reasonably be inferred,' W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 39, at 242 (5th ed. 1984) in contrast to direct evidence where there is direct eyewitness testimony of the ultimate fact to be determined. Monaci v. State Horse Racing Commission, 717 A.2d 612 (Pa. Cmwlth. 1998). The inference from which the conclusion is derived 'is simply a clear, logical, reasonable and natural conclusion which the trier of fact may embrace or reject based on the evidence in the case.' Bixler v. Hoverter, 491 A.2d 958, 959 (Pa. Cmwlth. 1985); see also Commonwealth v. Shaffer, [288 A.2d 727 (Pa. 1972)] ('an inference is no more tha[n] a logical tool enabling the trier of fact to proceed from one fact to another.') The facts presented are the foundation of any inference and will determine whether that inference is reasonable. Ellis v. City of Pittsburgh, 703 A.2d 593 (Pa. Cmwlth. 1997). A party is not entitled to an inference of fact which amounts to nothing more than a guess or conjecture. Flaherty v. Pennsylvania Railroad Co., [231 A.2d 179 (Pa. 1967)]. When properly proved, circumstantial evidence is entitled to as much weight as direct evidence. Commonwealth v. Chambers, [599 A.2d 630 (Pa. 1991)].

---

**(continued…)**

Involuntary Treatment filed under Section 303 of the MHPA, which was later withdrawn. Certified Record (C.R.), Item #6, Ex. A at 18-19.

In addition, although Slaughter makes several references to the procedures utilized under Section 302 of the MHPA, this appeal does not arise directly out of a Section 302 proceeding or a request for expungement of an involuntary commitment under Section 302, see, e.g., In re Vencil, 120 A.3d 1028 (Pa. Super.), appeal granted, 128 A.3d 1183 (Pa. 2015); rather, this is a civil proceeding regarding whether Slaughter is prohibited from purchasing or possessing a firearm. See D'Alessandro.

Id. at 677 n.8.

In addition, contrary to Slaughter's assertions, our Supreme Court holds that the level of proof required to establish a case before the ALJ is the same degree of proof as used in most civil proceedings, *i.e.*, a preponderance of the evidence. D'Alessandro v. Pa. State Police, 937 A.2d 404 (Pa. 2007) (preponderance of the evidence standard applied to hearing before ALJ on applicant's challenge to denial of license to carry a firearm based on disqualification under the Federal Gun Control Act, 18 U.S.C. §§921-931). A preponderance of the evidence standard, the lowest evidentiary standard, is tantamount to "a more likely than not" inquiry. Carey v. Dep't of Corr., 61 A.3d 367, 374 (Pa. Cmwlth. 2013). Courts describe a preponderance of the evidence as evidence that has sufficient weight to "tip the scales on the side of the plaintiff," Se-Ling Hosiery v. Marguilies, 70 A.2d 854, 856 (Pa. 1950), and as "such proof as leads the fact-finder ... to find that the existence of a contested fact is more probable than its nonexistence," Sigafoos v. Pa. Bd. of Prob. & Parole, 503 A.2d 1076, 1079 (Pa. Cmwlth. 1986).

Here, the ALJ determined the PSP did not meet its burden of proving that "[Slaughter] was involuntarily committed to a mental health institution pursuant to the MHPA, specifically 50 P.S. §7302." ALJ Op., 9/17/15, at 5. He explained: "Other than the forms used to request a §7303 hearing, which is normally based only upon a finding of involuntary commitment pursuant to §7302, there is lack of certification by the examining physician to show that inpatient care was necessary or that [Slaughter] was committable." Id. at 7. The ALJ also noted

15

the PSP was not at fault for failing to meet its burden; rather, he stated that poor record keeping by Temple University Hospital and mental health professionals led him to "guess at best what actually occurred and what findings were made by the certifying physician, Dr. Ning Herron, on October 3, 2005." Id. (record citation omitted).[8] We disagree with the ALJ's conclusion.

At the outset, we note, a careful reading of the ALJ's opinion reveals no mention of the correct level of proof in this proceeding, *i.e.*, preponderance of the evidence. D'Alessandro. Nor did the ALJ acknowledge that the PSP could meet its burden here through the use of circumstantial evidence. See Brandon.

In addition, we disagree with the ALJ's conclusion regarding the documentary evidence the PSP presented here. Specifically, our review of the documentary evidence that the PSP submitted before the ALJ reveals that Philadelphia County notified the PSP of Slaughter's involuntary commitment on a form devised by the PSP, which was submitted to the PSP by Michael Covone, Deputy Director of the Office of Mental Health. C.R., Item #6, Ex. A at 7. The

_____

[8] Although the Philadelphia County Office of Mental Health records indicate that a Section 302 application was filed for a "Mason" (rather than "Nathan") Slaughter, see C.R., Item #6, Ex. A at 11-12, the ALJ stated:

> [T]he court has no problem concluding the records all pertain to Nathan Slaughter even though the 302 application clearly states the patient as Mason Slaughter. The remaining identifying information[:] date of birth, social security number, address, and date of commitment, is the same for Nathan Slaughter and Mason Slaughter. It is apparent that someone preparing the Section 302 application misunderstood the pronunciation of [Slaughter's] first name.

ALJ's Op., 9/17/15, at 5-6 (record citation omitted).

16

form indicates Slaughter was involuntarily committed at the Temple University Hospital, Episcopal Campus, and that Dr. Ning Herron certified the necessity of involuntary commitment pursuant to Section 6105(c)(4) of the UFA. Id.

The Philadelphia County Office of Mental Health also transmitted records to the PSP indicating that a Section 302 application was filed for Slaughter based on a suicide attempt. Id. at 11-12. That document states: "22YO MALE STATES THAT HE IS HAVING PROBLEMS. HE TOOK A LARGE QUANTITY OF ASPIRIN IN A SUICIDE ATTEMPT. PT HAS LARGE ASPIRIN LEVEL IN HIS BLOOD." Id. at 12. It indicates Sean Lenahan, M.D., petitioned for the Section 302 examination, and Onilda Herran, M.D., examined Slaughter. Id. at 11. That record also states that the "EXAM DISPOSITION" was "hold (re-exam)[.]" Id. (emphasis added).

In addition, the PSP submitted records from the Philadelphia County Court of Common Pleas, which included an "Application for Extended Involuntary Treatment" pursuant to Section 303 of the MHPA. Id. at 17-20. That record indicates that, pursuant to Section 303 of the MHPA, William Dubin, Chief Medical Officer at the Temple University Hospital, Episcopal Campus, petitioned for an extension of Slaughter's "Current Commitment Under Section 302" (which was set to expire on 10/8/2005). Id. at 16. The record states that Dubin indicated that:

> Nathan Slaughter has acted in such manner as to cause a responsible party to believe that he/she is severally mentally disabled as specified in the attached 302 form. He/she was admitted to Episcopal Campus Temple University Hospital for involuntary emergency examination and treatment on October 3

17

2005 at 11:30AM under Section 302. He/she was examined by [Dr.] Onilda Herran and was found to be in need of continued treatment. I respectfully request, therefore, that he/she be certified by the court for extended involuntary emergency treatment under Section 303.

Id. at 18. That record also states that, after examination, Javed Joy, M.D., attested: "I hereby affirm that I have examined Nathan Slaughter on 10/05/2005 to determine if he/she continues to be severely mentally disabled and in need of treatment[,]" and that the "**TREATMENT NEEDED**" was "Continue inpatient hospitalization for next 20 days." Id. at 18-19 (emphasis added). Dr. Joy further stated that Slaughter "continues to be severely mentally disabled and in need of treatment." Id. at 19. Based on an examination of Slaughter, Dr. Joy made the following findings: "Guarded, suspicious, semi cooperative, anxious at times, mood 'OK', affect blunted, - SI/HI even though status post suicide attempt, - psychosis even though doesn't want to answer most of my questions, poor insight/judgment, refusing medications[.]" Id. at 18.

Moreover, on a form entitled "**NOTICE OF INTENT TO FILE A PETITION FOR EXTENDED INVOLUNTARY TREATMENT AND EXPLANATION OF RIGHTS (303)**[,]" Dr. Joy indicated that he also informed Slaughter that "Episcopal Campus Temple University Hospital intends to file an application with the Court of Common Pleas to extend your involuntary treatment for up to 20 more days." Id. at 20 (emphasis added). All of these statements were made subject to the "**IMPORTANT NOTICE**" that "**ANY PERSON WHO PROVIDES ANY FALSE INFORMATION ON PURPOSE WHEN COMPLETING THIS FORM MAY BE SUBJECT TO CRIMINAL PROSECUTION AND MAY FACE CRIMINAL PENALTIES INCLUDING CONVICTION OF A MISDEMEANOR.**" Id. at 17. The Court of Common

18

Pleas subsequently marked the Section 303 petition "withdrawn" after Slaughter agreed to a voluntary commitment pursuant to Section 201 of the MHPA. Id. at 21. However, the order marking the 303 petition withdrawn stated, "a new 303 Petition [could be filed] based on the underlying 302 behavior within [20] days of today's date …." Id.

Upon review, we conclude the ALJ erred in determining that the documents the PSP presented were not sufficient to satisfy its burden of showing that the record of Slaughter's disqualifying involuntary commitment under Section 302 was accurate. While the PSP was unable to present a copy of the actual 302 petition or the Temple University hospital records regarding Slaughter because those records, which are older than seven years, no longer exist,[9] the documents the PSP presented are sufficient to satisfy its burden of showing that the record of Slaughter's disqualifying involuntary commitment was accurate. To that end, the records the PSP submitted at the hearing show Slaughter was involuntarily committed for inpatient care and treatment under Section 302 of the MHPA, and an examining physician certified that inpatient care was necessary or that Slaughter was committable as required by Section 6105(c)(4) of the UFA. See C.R., Item #6, Ex. A at 6, 7, 11-13, 16-21. The ALJ erred in concluding otherwise.[10]

_____

[9] See C.R. at Item #6, Exs. C, D; ALJ's Hearing, 10/22/14, Notes of Testimony at 35, 74.

[10] Further, contrary to Slaughter's assertions, we discern no violation of his right to due process. Fundamentally, due process affords a party notice and an opportunity to be heard. Piccolella v. Lycoming Cnty. Zoning Hearing Bd., 984 A.2d 1046 (Pa. Cmwlth. 2009). Due process principles require an opportunity, among other things, to hear evidence adduced by an opposing party, cross-examine witnesses, introduce evidence on one's own behalf, and present argument. Id. In this case, Slaughter was afforded all process due.

19

## B. Virginia Court Order
### 1. Contentions

The PSP also argues that the order of the Henrico General District Court in Virginia is unenforceable in Pennsylvania and should not be given full faith and credit in this state. The PSP contends that enforcing the Virginia court order would be contrary to a strong public policy in Pennsylvania to protect its citizens from the possession of firearms by prohibited persons. Additionally, the PSP asserts that enforcing the Virginia order would impose on the PSP a restriction for which the Virginia court lacked authority to adjudicate. The PSP maintains Pennsylvania has its own procedure for restoring an individual's right to possess firearms after an involuntary commitment. See 18 Pa. C.S. §§6105(f), 6111.1(g)(2); see also Section 113 of the MHPA, 50 P.S. §7113. The PSP notes that the ALJ did not address this issue based on his determination that the PSP did not meet its burden of proving Slaughter was disqualified from owning or possessing a firearm under Section 6105(c)(4) of the UFA.

Slaughter counters that this Court should give full faith and credit to the Virginia court order restoring Slaughter's firearm rights because the Virginia court system fully vetted the adequacy of the disability the PSP claims exists here and found that the disability could not legally be sustained.

### 2. Analysis

The U.S. Constitution requires that full faith and credit "shall be given in each State … to the judicial [p]roceedings of every other State." U.S. CONST. art. IV, §1. "The Full Faith and Credit Clause thus precludes a party from attacking collaterally a judgment of one state by attempting to re-litigate the

underlying dispute resolved by that judgment in another state." Wilkes v. Phoenix Home Life Mut. Ins. Co., 902 A.2d 366, 376 (Pa. 2006) (emphasis added). "Thus, full faith and credit typically requires that a state give a judgment the same res judicata effect the judgment would have been afforded in the state in which it was rendered." Id. (citing Thompson v. Thompson, 484 U.S. 174 (1988); Durfee v. Duke, 375 U.S. 106 (1963)).

*Res judicata*, or claim preclusion, prohibits parties involved in prior, concluded litigation from subsequently asserting claims in a later action that were raised, or could have been raised, in the previous adjudication.[11] Wilkes. The doctrine of *res judicata* developed to shield parties from the burden of re-litigating a claim with the same parties, or a party in privity with an original litigant, and to protect the judiciary from the corresponding inefficiency and confusion that re-litigation of a claim would breed. Id.

Here, in December 2013, in response to Slaughter's *unopposed* petition, see N.T. at 109-110, the Henrico General District Court in Virginia issued a form order stating:

---

[11] In Virginia, the doctrine of *res judicata* is expressed as follows:

> A party whose claim for relief arising from identified conduct, a transaction, or an occurrence, is decided on the merits by a final judgment, shall be forever barred from prosecuting any second or subsequent civil action against the same opposing party or parties on any claim or cause of action that arises from that same conduct, transaction or occurrence, whether or not the legal theory or rights asserted in the second or subsequent action were raised in the prior lawsuit ....

Raley v. Haider, 747 S.E.2d 812, 815 (Va. 2013) (citation omitted).

[ ] Without a hearing   [ ] With a hearing, the court has considered the petition to restore the right to purchase, possess or transport a firearm.

After receiving and considering evidence concerning the circumstances regarding the disabilities referred to in the petition filed in this case, which is hereby incorporated by reference, and the petitioner's criminal history, treatment record, and reputation as developed through character witness statements, testimony or other character evidence,

[x] The court finds that the petitioner will not likely act in a manner dangerous to public safety and granting the relief would not be contrary to the public interest. Therefore, the court grants the petition pursuant to [ ] § 18.2-308.1:1 [ ] § 18.2-308.1:2 or [x] § 18.2-308.1:3, and the petitioner's right to purchase, possess or transport a firearm is hereby restored,

The clerk is directed to certify and forward forthwith to the Central Criminal Records Exchange a copy of this order.

[ ] The relief sought by the petitioner is denied and the right to purchase, possess or transport a firearm is not restored by this court.

C.R., Item #6, Ex. A at 29.

We do not believe the Full Faith and Credit Clause applies here. As explained above, the Full Faith and Credit Clause precludes a party from collaterally attacking a judgment of one state by attempting to re-litigate the underlying dispute resolved by that judgment in another state. Wilkes. This is not what occurred here. To that end, the judgment in the Henrico General District Court restoring Slaughter's right to purchase, possess or transport a firearm was based on a finding that Slaughter "[would] not likely act in a manner dangerous to

22

public safety[.]" C.R., Item #6, Ex. A at 29; see Va. Code §18.2-308.1:3(B). However, the issue in this case is whether the PSP met its burden of proving that the record of Slaughter's involuntary commitment pursuant to Section 302 of the MHPA was accurate. See 18 Pa. C.S. §6111.1(e). By presenting evidence to prove the accuracy of the record of Slaughter's involuntary commitment pursuant to Section 302, the PSP was not collaterally attacking the judgment of the Henrico General District Court by attempting to re-litigate the underlying dispute resolved by that judgment. Thus, the Full Faith and Credit Clause is inapplicable.

To that end, the question before the Henrico General District Court was similar to that at issue in a proceeding under 18 Pa. C.S. §6105(f)(1), which states:

> Upon application to the court of common pleas under this subsection by an applicant subject to the prohibitions under subsection (c)(4), the court may grant such relief as it deems appropriate if the court determines that the applicant may possess a firearm without risk to the applicant or any other person.

Id. There is no indication that Slaughter pursued this avenue of relief in Pennsylvania.[12]

---

[12] Nor is there any indication that Slaughter attempted to proceed pursuant to 18 Pa. C.S. §6111.1(g)(2) ("**Review by court**"), which provides:

> A person who is involuntarily committed pursuant to [S]ection 302 of the [MHPA] may petition the court to review the sufficiency of the evidence upon which the commitment was based. If the court determines that the evidence upon which the involuntary commitment was based was insufficient, the court shall order that the record of the commitment submitted to the [PSP] be expunged. …

Moreover, the Full Faith and Credit Clause does not compel a state to substitute the statutes of other states for its own statutes dealing with a subject matter over which it is competent to legislate. Gies v. Commonwealth, 770 A.2d 799 (Pa. Cmwlth. 2001). Here, Pennsylvania has its own statute dealing with the restoration of an individual's right to own or possess firearms, see 18 Pa. C.S. §6105(f)(1); thus, it is not required to substitute a Virginia statute for its own law on this subject. Gies.

## IV. Conclusion

Based on the foregoing, we reverse the order of the ALJ, which directed the PSP to amend the PICS database so as to remove, as it pertains to Slaughter, the disability imposed under 18 Pa. C.S. §6105(c)(4).


ROBERT SIMPSON, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Pennsylvania State Police,   :
       Petitioner :
           :
   v.       : No. 858 C.D. 2015
           :
Nathan Slaughter,    :
      Respondent :

## **O R D E R**

**AND NOW**, this 21st day of March, 2016, the order of the Commonwealth of Pennsylvania, Office of Attorney General, dated May 15, 2015 in Case No. FAD01177, is **REVERSED**.

          _____
          ROBERT SIMPSON, Judge